(No. 89738.—

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* JAMES E. RYAN, Attorney General of Illinois, Appellant, v. TELEMARKETING ASSOCIATES, INC., *et al.*, Appellees.

*Opinion filed November 21, 2001.—Rehearing denied February 4, 2002.*

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Jerald S. Post, Floyd D. Perkins and Matthew D. Shapiro, Assistant Attorneys General, of Chicago, of counsel), for appellant.

Michael A. Ficaro and Susan G. Feibus, of Ungaretti & Harris, and David B. Goroff, of Hopkins & Sutter, all of Chicago, for appellees.

JUSTICE McMORROW delivered the opinion of the court:

In an amended complaint, the Attorney General, representing the people of this state, alleged that Telemarketing Associates, Inc., and Armet, Inc., corporations which operate as professional fund-raising services, and their director-owner, Richard Troia (collectively, the defendants), committed fraud and breached their fiduciary duty. The charged offenses were premised on the fact that defendants retained 85% of charitable funds collected on behalf of a charity, VietNow National Headquarters (VietNow), and, when soliciting, failed to inform donors that only 15% of their contribution would be distributed to the charity. The circuit court dismissed the complaint, finding that no cause of action had been stated under the facts alleged. The appellate court affirmed. 313 Ill. App. 3d 559. We granted the Attorney General's petition for leave to appeal (see 177 Ill. 2d R. 315) and now affirm the judgment of the appellate court.

BACKGROUND

The circuit court dismissed the Attorney General's amended complaint after defendants brought a motion to dismiss pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1998)). A motion to dismiss brought under section 2—615 admits all well-pled facts in the plaintiff's complaint. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 490 (1996). Consequently, the following facts, taken from the Attorney General's complaint, are accepted as true.

Telemarketing Associates, Inc. (Telemarketing), and Armet, Inc. (Armet), are professional, for-profit fund-raising corporations which are wholly owned and con-

trolled by Richard Troia. In accord with contracts negotiated with VietNow, an Illinois-based, not-for-profit corporation registered as an Illinois charitable trust, Telemarketing and Armet solicited funds on behalf of VietNow beginning in July 1987 and continuing into 1996. Pursuant to its contracts with VietNow, Telemarketing retained 85% of the gross collections in the State of Illinois "as its total compensation for all efforts and costs associated with the Marketing Program." Armet, through Troia, brokered fund-raising contracts between VietNow and various out-of-state, third-party solicitors. Pursuant to these contracts, VietNow received 10% of the gross receipts for out-of-state solicitations, while Armet, as the broker, received between 10% and 20% of these gross receipts.

Annual financial reports submitted to the Attorney General, as required by law (see 225 ILCS 460/4 (West 1998)), show that, from July 1987 until the end of 1995, defendants' fund-raising efforts on behalf of VietNow resulted in collection of $7,127,851. Of that amount, $6,073,887 was retained by defendants, netting VietNow $1,053,964, an amount just under 15% of the gross receipts.

VietNow does not complain that it did not receive the amounts for which it contracted, and there is no suggestion that defendants have not fully complied with the terms of their contracts. Further, VietNow has never expressed dissatisfaction with the fund-raising services provided by defendants and there is no allegation that defendants made affirmative misstatements to potential donors.

In an initial complaint filed on May 30, 1991, the Attorney General charged defendants with common law fraud and breach of their duty as fiduciaries of charitable assets. The complaint alleged that defendants, when making telephone solicitations on behalf of VietNow,

represented that funds donated would go to further Viet-Now's charitable purpose. However, according to the Attorney General, because the fees charged by defendants for conducting solicitation were "excessive in amount and an unreasonable use and waste of charitable assets," and because defendants did not advise donors that only 15% of the funds raised would be turned over to Viet-Now, defendants' solicitations were "knowingly deceptive and materially false" and constituted fraud and a breach of their fiduciary duty. The Attorney General asked the circuit court to surcharge the defendants for assets found to have been misspent or misused and to enjoin defendants from further solicitation.

The Attorney General amended his complaint on June 25, 1996, by adding paragraphs which alleged that defendants had renewed their contracts with VietNow and, under the same terms as before, had continued to solicit funds on behalf of VietNow into 1996. It was further alleged that defendants' solicitations were in violation of section 15(b)(5) of the Solicitation for Charity Act (225 ILCS 460/15(b)(5) (West 1996)), which requires professional fund-raisers to identify "fully and accurately" the purpose for which funds are solicited. The Attorney General contended that defendants violated this provision because they materially misrepresented the purpose for which funds were being solicited by telling contributors, either explicitly or implicitly, that funds collected would be used to help veterans, and that these statements were inherently false and misleading in light of the high percentage of funds retained by the defendants.

The complaint further alleged that defendants, by failing to reveal to donors the percentage of the contribution which would actually go to the charity, obtained money from donors under false pretenses. The same conduct was also alleged to constitute fraud under the Il-

linois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1996)) and under section 2 of the Uniform Deceptive Trade Practices Act (815 ILCS 510/2 (West 1996)). The complaint requested all available remedies and penalties authorized by section 9 of the Solicitation for Charity Act (225 ILCS 460/9 (West 1998)), including an injunction prohibiting defendants from conducting any future fund-raising services and forfeiture of their collected fees.

On September 6, 1996, defendants filed a section 2—615 motion to dismiss, arguing that charitable solicitations were protected speech under the first amendment. Defendants contended that, pursuant to *Riley v. National Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 101 L. Ed. 2d 669, 108 S. Ct. 2667 (1988), a claim of fraud could not be maintained when the basis for the complaint was the percentage of proceeds retained by the fund-raisers and the failure to volunteer information concerning the amount of the proceeds that would go to the charity.

The trial court granted the motion to dismiss, but allowed the Attorney General to amend his complaint. On December 4, 1996, the Attorney General filed an amended complaint. In addition to the previous allegations, the Attorney General now alleged that defendants' retention of 85% of the gross proceeds, although contracted for and agreed to by VietNow, constituted fraud because defendants retained donor lists from year to year and, accordingly, should have incurred decreased administrative costs. Thus, it was alleged, defendants' retention of donor lists was evidence that defendants' fee was not justified by high administrative costs.

Defendants again filed a section 2—615 motion to dismiss, which was granted. The dismissal was affirmed on appeal. 313 Ill. App. 3d 559. This court granted the Attorney General's petition for leave to appeal. 177 Ill. 2d R. 315.

## ANALYSIS

As noted above, the circuit court dismissed the Attorney General's complaint after defendants brought a section 2—615 motion to dismiss. A section 2—615 motion to dismiss challenges the legal sufficiency of the complaint. *Urbaitis v. Commonwealth Edison*, 143 Ill. 2d 458, 475 (1991). When reviewing a section 2—615 dismissal, the reviewing court must determine whether the allegations, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 490 (1996). Dismissal will be held proper only if it clearly appears that no set of facts can be proved under the pleadings which will entitle the plaintiff to recover. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86-87 (1996). We review *de novo* a section 2—615 motion to dismiss. *Neade v. Portes*, 193 Ill. 2d 433, 439 (2000); *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 391 (1999).

The Attorney General argues that the circuit court erred in dismissing his amended complaint. He contends that the complaint is legally sufficient because it sets forth all of the elements necessary to state a valid cause of action for common law fraud. According to the Attorney General, it is a material misrepresentation for defendants to tell prospective donors that funds solicited on behalf of VietNow are to be used for a charitable purpose when, in fact, defendants retain 85% of the funds solicited and fail to reveal that fact to potential donors at the point of solicitation.

The Attorney General further contends that the alleged misrepresentations also constitute constructive fraud and breach of fiduciary duty because the defendants' retention of 85% of the solicited proceeds, even if there was no intent to deceive, is "prejudicial to the public welfare" and a breach of the public's trust and confidence in charitable solicitation. The Attorney Gen-

eral admits that, ordinarily, donors anticipate that a certain amount of their contributions will be applied to "overhead." However, he claims that retention of 85% of donated funds goes well beyond any reasonable expectation of the public. As support for this position, the Attorney General has attached to his complaint the affidavits of 44 VietNow donors who assert that they would not have given money to the charity had they known how little of their donation was to be directed to the intended cause.

The Attorney General acknowledges the first amendment precedent relied upon by the circuit and appellate courts. Nevertheless, he claims the representations made by the defendants are actionable, notwithstanding the protections afforded charitable solicitations by the first amendment. We disagree.

We begin by examining the scope of first amendment guarantees afforded charitable solicitations. We use as guidance three decisions of the United States Supreme Court, *Village of Schaumburg v. Citizens For a Better Environment*, 444 U.S. 620, 63 L. Ed. 2d 73, 100 S. Ct. 826 (1980), *Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 81 L. Ed. 2d 786, 104 S. Ct. 2839 (1984), and *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 101 L. Ed. 2d 669, 108 S. Ct. 2667 (1988).

In *Schaumburg*, a not-for-profit corporation properly registered as a charitable trust under Illinois law was denied a permit to solicit door-to-door by the Village of Schaumburg pursuant to a Village ordinance which required permit applicants to provide "[s]atisfactory proof that at least seventy-five percent of the proceeds of such solicitations will be used directly for the charitable purpose of the organization." The charitable corporation sued the Village in federal district court, arguing that the ordinance violated the first and fourteenth amend-

ments. The charity was granted summary judgment and the court of appeals affirmed.

On review, the United States Supreme Court, after examining prior authority, concluded that charitable appeals for funds fall within the protection of the first amendment because "solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and *** that without solicitation the flow of such information and advocacy would likely cease." *Schaumburg*, 444 U.S. at 632, 63 L. Ed. 2d at 84, 100 S. Ct. at 834. Accordingly, the Court found that the 75% limitation in the Village's ordinance was "a direct and substantial limitation on protected activity that cannot be sustained unless it serves a sufficiently strong, subordinating interest that the Village is entitled to protect." *Schaumburg*, 444 U.S at 636, 63 L. Ed. 2d at 87, 100 S. Ct. at 836. The Court then rejected the Village's contention that its ordinance was justified because it was substantially related to the important governmental interests in preventing fraud, crime, and undue annoyance. Although the Court acknowledged that preventing fraud was indeed an important interest, the Court held that the ordinance was not narrowly drawn so as not to interfere with first amendment freedoms. *Schaumburg*, 444 U.S. at 636-37, 63 L. Ed. 2d at 87-88, 100 S. Ct. at 836. The ordinance only "peripherally promoted" the asserted governmental interest of protecting against fraud because, as the Court observed, costs incurred by charitable organizations conducting fund-raising campaigns can vary dramatically depending on a wide range of variables, some of which are beyond the control of the organization. *Schaumburg*, 444 U.S. at 637 n.10, 63 L. Ed. 2d at 87 n.10, 100 S. Ct. at 836 n.10. Thus, the Court found there was no rational reason to conclude that a charity which uses more than

25% of the funds it collects on fund-raising, salaries, and overhead should automatically be labeled fraudulent. *Schaumburg*, 444 U.S. at 636-37, 63 L. Ed. 2d at 87, 100 S. Ct. at 836.

Four years after rendering its decision in *Schaumburg*, the Supreme Court was asked to consider the constitutionality of a Maryland statute which prohibited charitable organizations from paying or agreeing to pay " 'as expenses in connection with any fund-raising activity a total amount in excess of 25 percent of the total gross income raised or received by reason of the fund-raising activity.' " *Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 950 n.2, 81 L. Ed. 2d 786, 792 n.2, 104 S. Ct. 2839, 2843 n.2 (1984), quoting Md. Code Ann., Bus. Reg. § 103A (1982). The statute contained a provision which authorized a waiver of the 25% limitation " 'in those instances where the 25% limitation would effectively prevent a charitable organization from raising contributions.' "

Reaffirming its holding in *Schaumburg*, the *Munson* Court held that the Maryland percentage-based statute, like the ordinance in *Schaumburg*, substantially restricted a protected first amendment activity and that "the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech ***." *Munson*, 467 U.S. at 968, 81 L. Ed. 2d at 803, 104 S. Ct. at 2853. Percentage-based limitations, the Court reiterated, are insufficiently related to the governmental interest in preventing fraud. Furthermore, the constitutional deficiencies of the percentage-based limitation could not be remedied by the addition of a waiver provision which granted governmental authorities the discretion to dispense with the percentage limitation upon a showing of financial necessity. *Munson*, 467 U.S. at 962, 81 L. Ed. 2d at 799-800, 104 S. Ct. at 2850. The *Munson* Court explained:

"The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud. That the statute in some of its applications actually prevents the misdirection of funds from the organization's purported charitable goal is little more than fortuitous. It is equally likely that the statute will restrict First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular. On the other hand, if an organization indulges in fraud, there is nothing in the percentage limitation that prevents it from misdirecting funds. In either event, the percentage limitation, though restricting solicitation costs, will have done nothing to prevent fraud." *Munson,* 467 U.S. at 966-67, 81 L. Ed. 2d at 802, 104 S. Ct. at 2852.

Despite *Munson's* condemnation of percentage-based limitations on charitable solicitation, the Supreme Court was called upon just four years later to decide whether another percentage-based regulation, which had recently been added to the North Carolina Charitable Solicitations Act, suffered from the same constitutional deficiencies as the laws struck down in *Schaumburg* and *Munson.* See *Riley v. National Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 101 L. Ed. 2d 669, 108 S. Ct. 2667 (1988). The North Carolina statute in *Riley* differed from the laws in *Schaumburg* and *Munson* in that it regulated professional for-profit fund-raisers rather than the charitable organizations themselves.

Responding to a study which showed that professional fund-raisers typically retained fees "well over 50% of the gross revenues collected in charitable solicitation drives," North Carolina enacted a statute which prohibited fund-raisers from charging an "unreasonable" or "excessive" fee. *Riley,* 487 U.S. at 784, 101 L. Ed. 2d at 681, 108 S. Ct. at 2761. A three-tiered, percentage-based schedule was used to define the "reasonable fee" that a

professional fund-raiser could charge. Specifically, a fund-raiser could charge up to 20% of its gross receipts without running afoul of the "reasonableness" requirement. A fund-raising fee between 20% and 35% of gross receipts, however, was presumptively unreasonable and excessive "if the party challenging the fund-raising fee also proves that the solicitation does not involve the dissemination of information, discussion, or advocacy relating to public issues as directed by the person established for a charitable purpose which is to benefit from the solicitation." Finally, the statute provided that, if the fund-raising fee was 35% or more of the gross receipts, the fund-raiser would carry the burden of proving that the fee was "necessary." Necessity, according to the statute, could be proved by evidence (1) that the fee was required due to the dissemination of information, discussion or advocacy for the charitable purpose, or (2) that the charity's ability to solicit would otherwise be "significantly diminished." The statute also required professional fund-raisers to disclose to potential donors, at the point of solicitation, the "average percentage of gross receipts actually turned over to charities by the fund-raiser for all charitable solicitations conducted in North Carolina within the previous 12 months." *Riley*, 487 U.S. at 786, 101 L. Ed. 2d at 682, 108 S. Ct. at 2672.

After close examination of the statute, the *Riley* Court ruled that the percentage-based definition of an "unreasonable" fee could not pass constitutional muster because "using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud." *Riley*, 487 U.S. at 789, 101 L. Ed. 2d at 684, 108 S. Ct. at 2673. The Court explained that the statute's defect was that it defined an "unreasonable" and "excessive" fee according to the percentage of total revenues collected, "[d]espite our clear holding in *Munson* that there is no nexus between the percentage

of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent." *Riley*, 487 U.S. at 793, 101 L. Ed. 2d at 687, 108 S. Ct. at 2675.

Moreover, the Court found the North Carolina statute suffered from a "more fundamental flaw" than the one in *Munson*—it placed fund-raisers at risk of having to rebut the presumption of unreasonableness, case by case, based on nothing more than "a loose inference that the fee might be too high." *Riley*, 487 U.S. at 793, 101 L. Ed. 2d at 687, 108 S. Ct. at 2676. The Court found it constitutionally unacceptable for fund-raisers to have to wait until "reasonable" fees were "judicially defined over the years." *Riley*, 487 U.S. at 793, 101 L. Ed. 2d at 687, 108 S. Ct. at 2676. In the interim, the Court held, fund-raisers would be unable to speak with any level of security and would run the risk of incurring litigation costs, as well as the possibility of a mistaken adverse ruling. *Riley*, 487 U.S. at 793-94, 101 L. Ed. 2d at 687, 108 S. Ct. at 2676. As a result, fund-raisers would be less inclined to contract with many charitable organizations, especially less popular ones, and the ability of charities to speak would be substantially diminished. *Riley*, 487 U.S. at 794, 101 L. Ed. 2d at 688, 108 S. Ct. at 2676.

The *Riley* Court also found constitutionally offensive the statutory provision which mandated fund-raisers to reveal to potential donors, at the point of solicitation, the amount of charitable proceeds turned over to a charity. The provision, the Court held, was a content-based regulation of protected speech which was unduly burdensome and not narrowly tailored. As the Court explained, a compelled disclosure requirement presumes, incorrectly, that a charity derives no benefit from funds collected but not disbursed to it. Further, a disclosure requirement would "almost certainly hamper the legitimate efforts of professional fundraisers to raise money for the charities they represent." *Riley*, 487 U.S. at 799, 101 L. Ed. 2d at 691, 108 S. Ct. at 2679.

Keeping in mind the holdings of *Schaumburg*, *Munson*, and *Riley*, we turn to the case at bar. The Attorney General contends that the present case is distinguishable from *Riley* and its predecessors because here the problem of fraud is being attacked, not through the application of "broad prophylactic" ordinances or statutes affecting all fund-raisers (see *Schaumburg*, 444 U.S. at 637, 63 L. Ed. 2d at 88, 100 S. Ct. at 836), but through the enforcement of the state's antifraud laws against specific defendants for "specific instances of deliberate deception." See *Riley*, 487 U.S. at 803, 101 L. Ed. 2d at 694, 108 S. Ct. at 2681 (Scalia, J., concurring). Thus, the Attorney General reasons, his complaint utilizes the "less intrusive" measures for attacking fraud suggested by the *Schaumburg* Court. *Schaumburg*, 444 U.S. at 637, 63 L. Ed. 2d at 88, 100 S. Ct. at 836. The Attorney General argues:

> "The complaint [at issue in this case] is the constitutional alternative to the prohibitive legislation at issue in *Schaumburg* and the burden-shifting legislation at issue in *Munson* and *Riley*. Here, the people seek to have the judicial process determine, under the specific facts of this distinct case, whether these particular defendants defrauded the public and violated their fiduciary duties as holders of charitable funds."

The Attorney General's argument suggests, in part, that the present action is a "less intrusive" means of combating fund-raising fraud because it is an instance of individual litigation, *i.e.*, a single complaint, and not a broad, regulatory statute. We reject this contention. When the Supreme Court spoke of the government's right to pursue "less intrusive" measures, it plainly meant that the government retained the right to regulate the conduct of fund-raisers in a manner which was "less intrusive" of their *constitutional rights*. The present action is not "less intrusive" within the meaning of the Supreme Court's holdings simply because it is an instance of individual litigation.

Thus, in this case, to determine whether the Attorney General's complaint is a "less intrusive" means of regulating defendants' speech and, hence, permitted by *Riley* and its predecessors, we must examine the allegations of the complaint and decide whether those allegations offend the first amendment principles set forth in the Supreme Court decisions. Stated otherwise, we must determine whether the Attorney General's complaint operates to limit defendants' ability to engage in solicitation—an activity protected by the first amendment—in a manner found constitutionally impermissible by the Supreme Court in *Schaumburg, Munson* and *Riley*. We conclude that it does.

The Attorney General's complaint seeks to enjoin defendants from conducting any future fund-raising activities based on allegations that defendants, when soliciting on behalf of VietNow, committed "fraud" because they made "false statements" concerning the purpose for which funds were being solicited. However, the statements made by defendants during solicitation are alleged to be "false" only because defendants retained 85% of the gross receipts and failed to disclose this information to donors. Thus, the Attorney General's complaint is, in essence, an attempt to regulate the defendants' ability to engage in a protected activity based upon a percentage-rate limitation. This is the same regulatory principle that was rejected in *Schaumburg, Munson* and *Riley*.

As the Supreme Court has pointed out, high solicitation costs, and a solicitor's high rate of retaining receipts, can be attributable to a number of factors. Certain types of fund-raising campaigns, for example, include a wide range of activities that must be paid for. The present case illustrates this point. The Attorney General has attached defendants' contracts with VietNow to his complaint and made them a part of the pleadings. These

contracts show that, in exchange for its fee, Telemarketing agreed to supply and pay the salaries of all marketing personnel, as well as pay all costs for an office and phones. In addition, Telemarketing agreed to be responsible for producing, publishing, editing and paying all costs for the annual publication of more than 2,000 copies of an advertising magazine which would "increase community awareness of [VietNow]." The contract required Telemarketing to conduct "an efficient and professional marketing program, promote goodwill on behalf of [VietNow], and enhance good public relations."

Contracts between VietNow and Armet provided that third-party professional fund-raisers would conduct an advertising and public awareness campaign in conjunction with the sale of advertizing in a quarterly publication. The quarterly publication would be produced by Armet. At least 30% of the quarterly publication was to be devoted to editorial content provided by VietNow. Armet also agreed to maintain a live, nationwide, toll-free telephone number which individuals could call to obtain information regarding VietNow.

Defendants in this case were contracted to perform a wide range of activities on behalf of VietNow, all of which were to be paid for out of the solicited funds. This example illustrates the principle that, because of the many different factors that may contribute to high solicitation costs, it is incorrect to assume, as a matter of law, that there is a nexus between high solicitation costs and fraud. See *Riley*, 487 U.S. at 793, 101 L. Ed. 2d at 687, 108 S. Ct. at 2675.

Further, and more fundamentally, it is incorrect to presume that there is nexus between high solicitation costs and fraud because, as the Supreme Court has explained, the percentage of proceeds turned over to a charity is not an accurate measure of the amount of funds used "for" a charitable purpose. See *Munson*, 467 U.S. at

967 n.16, 81 L. Ed. 2d at 802 n.16, 104 S. Ct. at 2852 n.16. Charities often reap nonmonetary benefits by having their message disbursed by the solicitation process. In fact, as the *Schaumburg* Court observed, the solicitation may be so intertwined with informative and persuasive speech that the solicitation itself is part of the charitable purpose. This point is aptly demonstrated in the case at bar. The defendants' contracts with VietNow required defendants to produce publications that "increased community awareness" about VietNow. Defendants were also directed to conduct their solicitations in a manner that would "promote goodwill" on behalf of VietNow. The fund-raising services defendant provided, therefore, were inextricably intertwined with the advancement of VietNow's philosophy and purpose. Moreover, because the solicitation process is so enmeshed with the charitable purpose, it is irrelevant whether or not defendants' administrative costs were reduced, as the Attorney General alleged, because defendants retained donor lists from year to year.

For similar reasons, fraud cannot be defined in such a way that it places on solicitors the affirmative duty to disclose to potential donors, at the point of solicitation, the net proceeds to be returned to the charity. Compelled disclosure, as the *Riley* Court held, is based on a presumption that the net proceeds returned to a charity are the only benefit that a charity derives from solicitation. This presumption is incorrect. As discussed above, often a large portion of the funds solicited are used "for a charitable purpose" although only a fraction of the proceeds are actually turned over to the charity. The net proceeds returned to a charity do not accurately reflect the amount of funds which go toward the charitable purpose because that figure fails to take into consideration the charity's nonmonetary objectives, such as dissemination of information and advocacy, which are by-

products of the solicitation that cannot be quantified. Consequently, any rule of law which burdens speech by requiring solicitors to make statistical disclosures, at the point of solicitation, is not narrowly tailored to the state's asserted interest of protecting the public from being misled about the way their charitable dollars are being spent. See *Riley*, 487 U.S. at 798-99, 101 L. Ed. 2d at 690-91, 108 S. Ct. at 2678-79.

We note, too, that professional fund-raisers who are telemarketers, as the defendants in this case, are particularly disadvantaged by a disclosure requirement. As the *Riley* Court observed, "if the potential donor is unhappy with the disclosed percentage, the fundraiser will not likely be given a chance to explain the figure; the disclosure will be the last words spoken as the donor *** hangs up the phone." *Riley*, 487 U.S. at 800, 101 L. Ed. 2d at 691, 108 S. Ct. at 2679.

Finally, we note that, although the Attorney General's complaint is aimed at regulating the fund-raising efforts of the defendants, this case has far-reaching implications for all fund-raisers. If a complaint such as the one at issue in this case was allowed to proceed, all fund-raisers in this state would have the burden of defending the reasonableness of their fees, on a case-by-case basis, whenever in the Attorney General's judgment the public was being deceived about the charitable nature of a fund-raising campaign because the fund-raiser's fee was too high. Fund-raisers, therefore, would be at a constant risk of incurring litigation costs, as well as civil and criminal penalties, which could produce a substantial chilling effect on protected speech, based on nothing more than a "loose inference that the fee might be too high." See *Riley*, 487 U.S. at 793, 101 L. Ed. 2d at 687, 108 S. Ct. at 2676. Such a procedure cannot be condoned.

In light of the foregoing, we conclude that the Attorney General's complaint suffers from the same

"fundamental flaw" described by the Supreme Court in *Schaumburg, Munson* and *Riley*. The complaint incorrectly presumes that there is a nexus between high solicitation costs and fraud and attempts to regulate defendant's constitutionally protected solicitations on that basis. Contrary to the Attorney General's contentions, the complaint is not a "less intrusive" means of regulation but is, instead, indistinguishable from the regulatory measures struck down in *Schaumburg, Munson* and *Riley*. We conclude, therefore, that the Attorney General's complaint is prohibited under first amendment principles and was properly dismissed.

We are mindful of the opportunity for public misunderstanding and the potential for donor confusion which may be presented with fund-raising solicitations of the sort involved in the case at bar. However, the United States Supreme Court decisions in *Riley, Munson* and *Schaumburg* compel us to reach the decision we announce today.

## CONCLUSION

The Attorney General's complaint is not legally sufficient. It does not state a cause of action for fraud or breach of fiduciary duty. Although the Attorney General purports to be charging defendants with specific instances of misrepresentation, his complaint is, at its core, a constitutionally impermissible percentage-based limitation on defendants' ability to engage in a protected activity. As such, the complaint is constitutionally deficient pursuant to *Schaumburg, Munson*, and *Riley*. Accordingly, we affirm the judgment of the appellate court, which affirmed the dismissal of the Attorney General's complaint.

*Affirmed.*