THE PURE OIL COMPANY, Appellee, *vs.* THE MILLER-MC-FARLAND DRILLING COMPANY, INC., *et al.* Appellants.

*Opinion filed April 15, 1941—Rehearing denied June 12, 1941.*

FARTHING, J., dissenting.

CREIGHTON & KERR, for appellants.

SMITH & McCOLLUM, VINSON, ELKINS, WEEMS & FRANCIS, and BEN A. HARPER, for appellee.

Mr. JUSTICE SMITH delivered the opinion of the court:

On April 24, 1879, The Church of Christ, commonly known as the Christian Church of Zif, Illinois, was incorporated under the statute relating to the incorporation of religious societies. The corporation was authorized, by statute, to acquire and own land not exceeding ten acres in area and to erect and maintain such houses, buildings and other improvements as might be necessary for the convenience and comfort of the congregation, church, or society. (Ill. Rev. Stat. 1874, chap. 32, sec. 42.) This church organization has been continuously in existence since that date.

On March 7, 1896, John Hubble was the owner of the southwest quarter of the southeast quarter of section thirty-two, township two north, range eight east of the Third Principal Meridian in Wayne county, Illinois. On that date, John Hubble and Samantha Hubble, his wife, conveyed to "the Trustees of the Church of Christ, known as the Christian church of Gif, in the county of Wayne and State of Illinois" a tract of land described in the deed as follows: "Beginning (9) rods, N. of the N. E. corner of the S. E. of S. W. qr. of the E. qr, running (8) rods West thence (10) rods North thence (8) rods East, thence (10) rods South to beginning containing (1-2) acre in Section (32) Town (2), (8) East (3) Principal Meradian." It is admitted by the pleadings, and stipulated in the record, that this description in the deed was erroneous and that the tract of land intended to be conveyed is correctly described as: Beginning at a point on the east line of said forty-acre tract nine rods north of the southeast corner thereof, running thence west eight rods, thence north ten rods, thence east eight rods, thence south ten rods, to the place of beginning. It is also admitted by the pleadings, and not disputed, that the church immediately took possession of the tract and erected a church building thereon.

It is also agreed by the parties that this building continued to be occupied and used by the church for church purposes, and that such services continued until 1926 or 1927. The parties further agree that no church services of any kind have been held in the building, or on the premises, since 1927.

The record further shows that some time about the year 1934 the church building had deteriorated until it was unfit for occupancy or use, and was in a general bad state of repair, both the interior and exterior. At that time a small group of citizens of the community, some of whom were, and some of whom were not, members of the church, met on the premises and decided to reroof the building. Shortly thereafter the building was reroofed. The cost of procuring the shingles necessary to reroof the building at that time was paid by voluntary contributions. For that purpose about $60 was raised. A portion of this expense was contributed by John Hubble, the grantor in the deed, and the balance was contributed by others, some of whom were, and some of whom were not, members of the church. John Hubble attended the meeting at which the arrangements were made for reroofing the church and assisted in putting on the roof. The roof was applied by several men residing in the community, donating their services, some of whom, including John Hubble, were not members of the church.

The record shows that the interior of the church was badly in need of repairs. The plastering was off the ceiling and a part of the side walls. The window lights were nearly all broken; the plastering had fallen down on the floor and on the seats, and the doors had been standing open for years. On the outside, some of the weatherboarding had been torn off or had fallen off from decay; the doors were in bad condition; there was no stove or other heating facilities; a part of the piano was gone and what remained was in a badly dilapidated condition; the keys

and a part of the inside of the piano had been crushed in, evidently by vandals, and a part of the frame was gone; the seats, floor and pulpit were covered with dust, fallen plaster and paper. The record does not show that any repairs, except the new roof were made at that, or any other time, until about the time, or shortly before, this suit was filed. No services were held in the church after the same was reroofed until some four years later, and after the controversy here involved arose over the title to the property.

On April 6, 1936, A. Behymer and wife executed to R. Z. McGowan an oil and gas lease covering all of the southwest quarter of the southeast quarter of section thirty-two. The record shows that this lease was taken by Mc-Gowan for the Pure Oil Company and is now owned by that company. The record also shows that on April 6, 1936, John Hubble and wife executed to R. Z. McGowan an oil and gas lease covering several tracts of land, but not including the church site. One of these tracts adjoined the church site on the east. This lease was also taken by McGowan for the Pure Oil Company and now belongs to that company.

On October 20, 1938, John Hubble and wife executed a mineral deed covering the church site to the Pure Oil Company, purporting to convey all the oil and gas in and under and that might be produced from said lands to said company. On the day this mineral deed was executed a representative of the Pure Oil Company accompanied John Hubble and the notary public, who later took the acknowledgment to the mineral deed, to the church site. While there, the agent of the Pure Oil Company, in the presence of the notary, read an affidavit which he had prepared for John Hubble to sign. In this affidavit it was stated, among other things, that no services had been held in the church for about twelve years. He asked Hubble if the facts stated in the affidavit, as read, were true, and if it was

his purpose in coming there to repossess and retake the land, to which Hubble answered in the affirmative. Hubble made no further statement. He either signed the affidavit there or after they had returned to Hubble's home, at which time the mineral deed was signed and acknowledged by John Hubble and wife. At that time the agent of the Pure Oil Company had in his possession an affidavit to which he had procured the signature of Alonzo Behymer on October 1, 1938, and which was prepared and notarized by this agent of the Pure Oil Company on that date. In this affidavit of Behymer he stated, among other things, that he acquired title to the southwest quarter of the southeast quarter of section thirty-two in 1916 and had been in possession of the entire tract ever since, and was then in possession of the same, making no exception as to the church site.

The appellee, the Pure Oil Company, claims the oil and gas in and under and that may be produced from the church site under the mineral deed executed by John Hubble and wife, on October 20, 1938.

On July 6, 1940, A. Behymer, as trustee of the church, together with his wife and a number of other persons who were described in the lease as members of the church, executed an oil and gas lease to appellant the Miller-McFarland Drilling Company, Inc. On July 13, 1940, Samantha Hubble, wife of John Hubble, Leland Hubble and Alonzo Behymer, who were described as trustees of the church, and Leland Hubble and Samantha Hubble, described as members of the church, executed a document purporting to ratify and confirm the oil and gas lease executed by A. Behymer, as trustee of the church, and others described as members of the church, to the Miller-McFarland Drilling Company, Inc., on July 6, 1940.

On July 31, 1940, appellee filed this suit claiming to own the oil and gas in and under the church site. It was alleged in the complaint that after the execution and de-

livery of the lease from Alonzo Behymer and others, to the Miller-McFarland Drilling Company, Inc., on July 6, 1940, and the ratification, executed by Samantha Hubble and others, on July 13, 1940, the Miller-McFarland Drilling Company, Inc., entered upon the church site and placed a derrick and drilling equipment thereon and were threatening to drill an oil well in violation of the title and rights of appellee. On August 6, 1940, the court issued a temporary injunction, restraining the defendants from drilling on said church site or producing oil therefrom during the pendency of the suit. After a hearing on the merits the court entered a decree finding that appellee was the owner of the oil and gas in and under the property, granting the relief prayed for in the complaint, and made the injunction permanent. A statement by the trial judge of the reasons for his decision is included in the record. In this statement he found that the deed executed by John Hubble and wife, to the church, on March 7, 1896, conveyed a base or determinable fee with a possibility of reverter if, at any time, the land conveyed should cease to be used for church purposes. That the land had ceased to be used for church purposes not later than during the year 1927. That upon the cessation of such use the reverter took effect by operation of law and the title revested in John Hubble, the grantor. That John Hubble was vested with fee simple title to the property at the time he executed the mineral deed to appellee on October 20, 1938, and that this mineral deed conveyed to appellee all of the oil and gas in and under and that may be produced from said land.

The court also found that even though the language of the deed be construed as a condition subsequent, which would require a reentry after breach before the title revested in the grantor, that there had been a breach of the condition and that John Hubble had reentered and taken possession of the land before he executed the mineral deed to appellee, and that, even under that construction of the

deed, appellee was the owner of the oil and gas under its deed from John Hubble and wife, which was made after such reentry.

This appeal was perfected by the defendants for the purpose of reversing the decree in favor of appellee. The parties are agreed that the rights of all parties to the land in question depend upon the construction of the deed from John Hubble and wife, to the church, on March 7, 1896.

The deed was drawn in the form of a usual warranty deed. While it was somewhat awkwardly written and contained many misspelled words, no question is raised as to its execution or acknowledgment. The language in the deed from which the controversy arises, is as follows: "to belong to the Church of Christ known as the Christian Church at *Gif* so long as used by the aforesaid Church this deed to be in full *forse* at *eny* time if not used by said Church the aforesaid described land to revert back to the *origanal* owner."

There is a clear distinction between an estate on conditional or common law limitation and an estate on condition subsequent. This distinction has long been recognized by the courts. In *North* v. *Graham,* 235 Ill. 178, the limiting language in the deed was as follows: "said tract of land above described to revert to the party of the first part whenever it ceases to be used or occupied for a meeting house or church." In construing this language of the deed this court held, on page 180 of the opinion: "The estate taken by the church was a fee, because it was to continue in said organization as long as the land was devoted to the specified uses, which might be forever, but as it might end on the happening of an event it is what is usually called a 'determinable or qualified fee.' (*First Universalist Society* v. *Boland,* 155 Mass. 171.) 'Where one grants a base or determinable fee, since what is left in him is only a right to defeat the estate so granted upon the happening of a contingency, there is no reversion in him,—that is,

he has no future vested estate in fee, but only what is called a naked possibility of reverter, which is incapable of alienation or devise, although it descends to his heirs.' (Tiedeman on Real Prop. (3d ed.) sec. 291.) In Challis on Law of Real Property (p. 63) it is stated: 'Possibility of reverter denotes no estate, but, as the name implies, only the possibility to have an estate at a future time. Of such possibilities there are several kinds, of which two are usually denoted by the term now under consideration,—(1) the possibility that a common law fee may return to the grantor by breach of a condition subject to which it was granted; and (2) the possibility that a common law fee, other than a fee simple, may revert to the grantor by the natural determination of the fee.' The possibility of reversion expectant on such an estate as the one we are now considering is left in the person who limits it, but 'in the meantime the whole estate is in the grantee or owner, subject only to a possibility of reverter in the grantor. The grantee has an estate which may continue forever, though there is a contingency which, when it happens, will determine the estate. This contingency cannot with propriety be called a condition. It is a part of the limitation, and the estate may be termed a fee. Plowden uses the phrase, "fee simple determinable." (1 Preston on Estates, 441, 484.) 'Some estates were terminable by special or collateral limitations. * * * On the happening of the contingency the feoffer was in of his old estate without entry. * * * After such a fee it has commonly been supposed that there could be no remainder, but there was a so-called possibility of reverter to the feoffer and his heirs which was not alienable.' (Gray on Rule Against Perpetuities, 2d ed., sec. 13.) This author (sec. 32) questions whether there is now any such estate as a qualified or terminable fee, stating that it has not been sustained in England since the statute *Quia Emptores*, and argues that it ought not now to be sustained in this country. An estate of this nature has so

frequently been upheld by this court (*Fifer* v. *Allen,* 228 Ill. 507; *Becker* v. *Becker,* 206 id. 53, and cases cited;) that it must be held to be recognized as the settled law in this State. This is in accord with the great weight of authority in this country. (1 Jones on Law of Real Prop. secs. 630, 631; 2 Washburn on Real Prop. (4th ed.) *390; Kales on Future Interests, secs. 124, 126; 4 Kent's Com. (12 ed.) *390; 1 Tiffany on Law of Real Prop. secs. 81, 115, 116; 24 Am. & Eng. Ency. of Law, (2d ed.) 425; *First Universalist Society* v. *Boland, supra; Carney* v. *Kain,* 40 W. Va. 758, and cases cited.) Moreover, Gray concludes (sec. 41a) that a sound distinction in this regard may be made when property is given for charitable purposes, and that 'possibilities of reverter might be allowed where the first estate was for a charitable purpose; and it would seem immaterial whether the estate had been acquired by sale or gift.' This court in *Mott* v. *Danville Seminary,* 129 Ill. 403, and *Presbyterian Church* v. *Venable,* 159 id. 215, has held that a possibility of reverter was recognized by the law of this State."

In accordance with the above holding we are of the opinion that the language of the deed in question constituted a limitation and not a condition subsequent and there remained in the grantor merely a naked possibility of reverter. The language of the deed here involved simply stated when the natural termination of the fee would occur; it limits the time during which the granted estate would endure, and designates the time when the granted estate shall cease and *ipso facto* revert to the grantor. Under that language the estate granted remained in the grantee so long "as used by the aforesaid church." Upon the cessation of the use of the land granted by the church the title in the church ceased and reverted to the original grantor and he thereupon became revested with the fee simple title to the land, and was free to do with it as he might wish

unless he had done something to destroy the possibility of reverter prior to the termination of the estate granted.

We agree with the chancellor that the language contained in the deed in question was not a condition subsequent upon the breach of which the grantor would be entitled to reenter and repossess the estate, but constituted a limitation of the estate granted by which the duration of the estate was measured. The estate granted in the deed contains, within itself, its own dissolution so that it would return spontaneously to the grantor upon the happening of the event. The estate granted was to continue "so long as used" by the church. The church corporation had no power to hold or use real estate for any purpose except purposes of religious worship. (*First Methodist Episcopal Church* v. *Dixon,* 178 Ill. 260.) It was admitted by the pleadings that no religious services had been held on the property since 1927. The court below was clearly justified in finding that the property had been abandoned and its use for purposes of the church discontinued. Upon the happening of that event—the cessation of the use of the land, by the church—the title would revest in the grantor as a matter of law without any reentry or other act on his part.

There are, however, other attributes of an estate of this character which naturally affect the question of the right of reversion. When John Hubble executed this deed to the church no estate remained in him whatever. He had no future estate in the land but only a possibility of reverter which was incapable of alienation. The right remained in the grantor and his heirs but it could not be conveyed. It was not a reversion but a naked possibility of reverter which he could not convey or assign. Any attempt to convey this possibility of reverter would be wholly ineffective and would convey nothing for the reason that the grantor had no estate which he could convey.

It was a mere possibility. *Predestinarian Baptist Church v. Parker,* 373 Ill. 607; *Trustees of Presbyterian Church v. Venable,* 159 id. 215.

The record in this case shows that John Hubble, after the conveyance to the church, did attempt to convey whatever interest he had in the land to Ann Behymer about 1896.

With their answer in this case appellants filed a counterclaim. To this counter-claim appellee filed a reply. It attached to this reply a number of exhibits which were referred to therein.

Exhibit No. 1 attached to this reply was the affidavit of Alonzo Behymer. In that affidavit it was stated by Behymer that he was the owner of the entire forty-acre tract, which would include the church property. That he acquired title from his mother about the year 1916. That he immediately took possession and that the entire tract had been fenced and used by him since 1916.

Exhibit No. 2 attached to the reply of appellee was the affidavit of John Hubble. In that affidavit it was stated by John Hubble that he sold the forty-acre tract of land, which would include the church site, to Ann Behymer and that she took possession of it as soon as she purchased it and farmed and pastured it personally each and every year until her death. That, after her death, her surviving husband acquired the interests of her other heirs in the land and farmed and pastured the same personally each and every year until 1916, when he deeded the land to Alonzo Behymer.

Section 36 of the Civil Practice act provides that where exhibits are attached to a pleading such exhibits shall constitute a part of the pleading for all purposes. The result is that the facts stated in these exhibits must be regarded the same as if such facts had been stated in the reply. Section 40 (2) (Ill. Rev. Stat. 1939, chap. 110, par. 164) provides that every allegation not explicitly denied shall be

deemed to be admitted, with certain exceptions not necessary to be noticed in this connection. We cannot, therefore, overlook the fact that by this reply appellee alleged the conveyance by John Hubble and wife to Ann Behymer of the entire forty-acre tract about 1896. That she took possession of the whole forty-acre tract under that deed, and she and her heirs and their grantees have been in possession of the land continuously since that date. These allegations were not denied by appellants. They stand admitted by the pleadings. These facts being admitted in the record, the question of the effect of Hubble's attempt to convey his interest in the land, in which he had a mere possibility of reverter, cannot be disregarded by us in the decision of this case.

The well-established rule under which we have found that John Hubble had the possibility of reverter under his deed to the church also contains certain limitations and restrictions in connection with such right of reverter. One of these conditions is that the right of reverter cannot be alienated or assigned. (*Presbyterian Church* v. *Venable, supra.*) It was also held under this rule, in many of the earlier decisions, that an attempt by the owner of a possibility of reverter to convey the same destroyed the right itself. The principle upon which this holding was based was that to permit a grantor who has only a possibility of reverter to assert that right after he had voluntarily conveyed all his interest in the property would constitute a legal fraud and that he would not be permitted to assert a right in violation of his deed, even though that deed was inoperative, because the right which he attempted to convey was inalienable. It has also been held that the right of reverter, being incident to the particular estate, if the owner of this right attempts to assign his reversion the condition is thereby destroyed entirely; that the grantor, as owner of the reversion, could not thereafter

enforce it because he had parted with it and, yet, his grantee acquired no right which he could enforce because it was not assignable.

While the rule under which it is held that the attempt to convey a naked possibility of reverter will destroy it has been upheld by many courts of high standing, we have been unable to find any case in which this court has ever followed it to that extent. Neither have we ever expressly refused to follow that rule. The direct question seems to have never been raised or passed upon by this court. Nevertheless, the rule that a naked possibility of reverter cannot be alienated or assigned has been uniformly announced and followed in many decisions by this court, but we decline to extend the rule to the extent of holding that an attempt to alienate such right will destroy it.

As already stated, it does appear that after the execution and delivery of the deed from John Hubble to the church he conveyed the entire forty-acre tract, including the church site, to Ann Behymer. At the time he made this deed to Mrs. Behymer he had no estate in the church site which he could convey. The deed was wholly ineffective and conveyed nothing. Notwithstanding, he had no estate in the property at that time upon which this deed could operate as a conveyance, if this was a warranty deed, then under section 7 of the Conveyance act if at any time thereafter he acquired any estate in the lands described in the deed, the estate or interest so acquired would vest in him in trust for the use and benefit of Ann Behymer, her heirs and assigns. *Robeson* v. *Cochran,* 255 Ill. 355.

In this case John Hubble survived the happening of the contingency on which the limitation in his deed to the church was based. The event occurred upon which the estate revested in him. Under the statute, when that estate revested in him he took and held the estate in trust for the use of Ann Behymer and her heirs and their grantee Alonzo Behymer.

In view of the conclusions which we have reached the decree finding the title to the oil and gas in appellee cannot be sustained on this record. The record is unsatisfactory as to the character of the deed from John Hubble to Ann Behymer and the real estate therein described. There are sufficient facts, however, appearing from the pleadings in the record to warrant the court in holding that appellee company was not the owner of the oil and gas under the tract of land involved, if, in fact, the deed from John Hubble to Ann Behymer did not except from the conveyance the church site. That deed is shown in the record by the affidavits attached to the reply, only. In this state of the record we do not attempt to determine its effect, as a conveyance, or the rights of the parties in this suit.

We express no opinion as to the effect of the oil and gas lease, executed on April 6, 1936, by A. Behymer and wife to McGowan, which purported to cover the whole forty-acre tract, including the church site. Upon another trial the character and effect of the deed from Hubble to Behymer and the description therein of the property conveyed as well as the interest of Alonzo Behymer in the property, if any, will, no doubt, be made to more clearly appear. Also, any question of estoppel as between Behymer and the church may be fully litigated and determined. A new trial should be granted in order that the rights of all parties may be properly ascertained and determined. All parties should be granted leave to amend their pleadings if they desire so to do.

The decree is reversed and the cause remanded to the circuit court of Wayne county, with directions to grant a new trial and for further proceedings consistent with the views herein expressed.

*Reversed and remanded, with directions.*

Mr. JUSTICE FARTHING, dissenting.