ILLINOIS ex rel. MADIGAN, ATTORNEY GENERAL
OF ILLINOIS v. TELEMARKETING ASSOCIATES,
INC., et al.

No. 01–1806.   Argued March 3, 2003—Decided May 5, 2003

GINSBURG, J., delivered the opinion for a unanimous Court. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 624.

*Richard S. Huszagh,* Assistant Attorney General of Illinois, argued the cause for petitioner. With him on the briefs

were *Lisa Madigan*, Attorney General, *James E. Ryan*, former Attorney General, *Joel D. Bertocchi*, Solicitor General, *Barry B. Gross*, Chief Deputy Attorney General, and *Jerald S. Post*, *Floyd D. Perkins*, and *Matthew D. Shapiro*, Assistant Attorneys General.

*Deputy Solicitor General Clement* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Matthew D. Roberts, Jacob M. Lewis*, and *Catherine Hancock*.

*Errol Copilevitz* argued the cause for respondents. With him on the brief were *William E. Raney, Mackenzie Canter III*, and *Mark Diskin*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Richard E. Doran*, Attorney General of Florida, *Thomas E. Warner*, Solicitor General, *Louis F. Hubener* and *Matthew J. Conigliaro*, Deputy Solicitors General, *Jonathan A. Glogau, Arabella W. Teal*, Corporation Counsel of the District of Columbia, *Thomas R. Keller*, Acting Attorney General of Hawaii, and *Anabelle Rodríguez*, Attorney General of Puerto Rico, and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.*, of Alabama, *Gregg D. Renkes* of Alaska, *Mark Lunsford Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Thurbert E. Baker* of Georgia, *Alan G. Lance* of Idaho, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Albert B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Thomas F. Reilly* of Massachusetts, *Jennifer M. Granholm* of Michigan, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Phillip P. McLaughlin* of New Hampshire, *David Samson* of New Jersey, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Wayne Stenehjem* of North Dakota, *Betty D. Montgomery* of Ohio, *Hardy Myers* of Oregon, *Mike Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Charles Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont,

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the amenability of for-profit fundraising corporations to suit by the Attorney General of Illinois for fraudulent charitable solicitations. The controversy arises from the fundraisers' contracts with a charitable nonprofit corporation organized to advance the welfare of Vietnam veterans; under the contracts, the fundraisers were to retain 85 percent of the proceeds of their fundraising endeavors. The State Attorney General's complaint alleges that the fundraisers defrauded members of the public by falsely representing that "a significant amount of each dollar donated would be paid over to [the veterans organization] for its [charitable] purposes while in fact the [fundraisers] knew that . . . 15 cents or less of each dollar would be available" for those purposes. App. 9, ¶ 34. Complementing that allegation, the complaint states that the fundraisers falsely represented that "the funds donated would go to further . . . charitable purposes," *id.*, at 8, ¶ 29, when in fact "the amount . . . paid over to charity was merely incidental to the fund

*Jerry W. Kilgore* of Virginia, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, and *Hoke MacMillan* of Wyoming; and for the Council of Better Business Bureaus, Inc., et al. by *Steven J. Cole* and *Richard Woods.*

Briefs of *amici curiae* urging affirmance were filed for the American Teleservices Association by *Robert Corn-Revere;* for the Association of Fundraising Professionals et al. by *Geoffrey W. Peters* and *Walter J. Sczudlo;* for Disabled American Veterans by *Christopher J. Clay* and *John L. Moore, Jr.;* for the Free Speech Defense and Education Fund, Inc., et al. by *William J. Olson, John S. Miles, Herbert W. Titus, Mark Weinberg,* and *Mark Fitzgibbons;* for Independent Sector et al. by *Robert A. Boisture, Albert G. Lauber,* and *Lloyd H. Mayer;* and for Public Citizen, Inc., et al. by *Bonnie I. Robin-Vergeer* and *Alan B. Morrison.*

Briefs of *amici curiae* were filed for AARP by *Deborah M. Zuckerman, Stacy J. Canan,* and *Michael R. Schuster;* for Hudson Bay Co. of Illinois, Inc., by *Thomas H. Goodman* and *Anthony J. Gleekel;* and for Thirty-two Commercial Fundraisers et al. by *Charles H. Nave.*

raising effort," which was conducted primarily "for the private pecuniary benefit of" the fundraisers, *id.*, at 9, ¶ 35.

The question presented is whether those allegations state a claim for relief that can survive a motion to dismiss. In accord with the Illinois trial and appellate courts, the Illinois Supreme Court held they did not. That court was "mindful of the opportunity for public misunderstanding and the potential for donor confusion which may be presented with fund-raising solicitations of the sort involved in th[is] case," *Ryan* v. *Telemarketing Associates, Inc.*, 198 Ill. 2d 345, 363, 763 N. E. 2d 289, 299 (2001); it nevertheless concluded that threshold dismissal of the complaint was compelled by this Court's decisions in *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980), *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947 (1984), and *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988). Those decisions held that certain regulations of charitable subscriptions, barring fees in excess of a prescribed level, effectively imposed prior restraints on fundraising, and were therefore incompatible with the First Amendment.

We reverse the judgment of the Illinois Supreme Court. Our prior decisions do not rule out, as supportive of a fraud claim against fundraisers, any and all reliance on the percentage of charitable donations fundraisers retain for themselves. While bare failure to disclose that information directly to potential donors does not suffice to establish fraud, when nondisclosure is accompanied by intentionally misleading statements designed to deceive the listener, the First Amendment leaves room for a fraud claim.

I

Defendants below, respondents here, Telemarketing Associates, Inc., and Armet, Inc., are Illinois for-profit fundraising corporations wholly owned and controlled by defendant-respondent Richard Troia. 198 Ill. 2d, at 347–348, 763

N. E. 2d, at 291. Telemarketing Associates and Armet were retained by VietNow National Headquarters, a charitable nonprofit corporation, to solicit donations to aid Vietnam veterans. *Id.*, at 348, 763 N. E. 2d, at 291. In this opinion, we generally refer to respondents, collectively, as "Telemarketers."

The contracts between the charity, VietNow, and the fundraisers, Telemarketers, provided that Telemarketers would retain 85 percent of the gross receipts from donors within Illinois, leaving 15 percent for VietNow. *Ibid.* Under the agreements, donor lists developed by Telemarketers would remain in their "sole and exclusive" control. App. 24, 93–94, 102, ¶ 65. Telemarketers also brokered contracts on behalf of VietNow with out-of-state fundraisers; under those contracts, out-of-state fundraisers retained between 70 percent and 80 percent of donated funds, Telemarketers received between 10 percent and 20 percent as a finder's fee, and Viet-Now received 10 percent. 198 Ill. 2d, at 348, 763 N. E. 2d, at 291. Between July 1987 and the end of 1995, Telemarketers collected approximately $7.1 million, keeping slightly more than $6 million for themselves, and leaving approximately $1.1 million for the charity. *Ibid.*[1]

In 1991, the Illinois Attorney General filed a complaint against Telemarketers in state court. *Id.*, at 348–350, 763 N. E. 2d, at 291–292.[2] The complaint asserted common-law and statutory claims for fraud and breach of fiduciary duty. *Ibid.* It alleged, *inter alia*, that the 85 percent fee for which Telemarketers contracted was "excessive" and "not justified

---

[1] The petition for certiorari further alleges that, of the money raised by Telemarketers, VietNow in the end spent only about 3 percent to provide charitable services to veterans. Pet. for Cert. 2, and n. 1; see IRS Form 990, filed by VietNow in 2000, available at http://167.10.5.131/Ct0601_0700/0652/1M11INDV.PDF (as visited Apr. 10, 2003) (available in Clerk of Court's case file).

[2] References to the complaint in this opinion include all amendments to that pleading.

by expenses [they] paid." App. 103, ¶ 72. Dominantly, however, the complaint concerned misrepresentation.

In the course of their telephone solicitations, the complaint states, Telemarketers misleadingly represented that "funds donated would go to further Viet[N]ow's charitable purposes." *Id.*, at 8, ¶ 29. Affidavits attached to the complaint aver that Telemarketers told prospective donors their contributions would be used for specifically identified charitable endeavors; typical examples of those endeavors include "food baskets given to vets [and] their families for Thanksgiving," *id.*, at 124, paying "bills and rent to help physically and mentally disabled Vietnam vets and their families," *id.*, at 131, "jo[b] training," *id.*, at 145, and "rehabilitation [and] other services for Vietnam vets," *id.*, at 169 (some capitalization omitted in quotes). One affiant asked what percentage of her contribution would be used for fundraising expenses; she "was told 90% or more goes to the vets." *Ibid.* (capitalization omitted). Another affiant stated she was told her donation would not be used for "labor expenses" because "all members are volunteers." *Id.*, at 111 (capitalization omitted).[3] Written materials Telemarketers sent to each donor

---

[3] Under Illinois law, exhibits attached to a complaint and referred to in a pleading become part of the pleading "for all purposes." Ill. Comp. Stat., ch. 735, § 5/2–606 (1992); *Pure Oil Co.* v. *Miller-McFarland Drilling Co.*, 376 Ill. 486, 497–498, 34 N. E. 2d 854, 859 (1941); 3 R. Michael, Illinois Practice § 23.9, pp. 332–333, nn. 7–9 and accompanying text (1989) (collecting Illinois cases). Telemarketers' counsel stated at oral argument that the Illinois Supreme Court had "found as a matter of law that [the] affidavits were not part of the complaint." Tr. of Oral Arg. 40. We can locate no such finding in the court's opinion. Asked to supply a citation after argument, see *id.*, at 41, counsel directed us to the court's statement that "there is no allegation that [Telemarketers] made affirmative misstatements to potential donors." 198 Ill. 2d 345, 348, 763 N. E. 2d 289, 291 (2001)); see Letter from William E. Raney to William K. Suter, Clerk of the Court (Mar. 4, 2003). In so stating, the Illinois court overlooked, most obviously, the two affidavits attesting to Telemarketers' representations that "90% or more goes to the vets," and that there would be no "labor

represented that contributions would "be used to help and assist Viet[N]ow's charitable purposes." *Id.*, at 8, ¶ 30.[4]

The 15 cents or less of each solicited dollar actually made available to VietNow, the Attorney General charged, "was merely incidental to the fund raising effort"; consequently, she asserted, "representations made to donors [that a significant amount of each dollar donated would be paid over to Viet[N]ow for its purposes] were knowingly deceptive and materially false, constituted a fraud[,] and were made for the private pecuniary benefit of [Telemarketers]." *Id.*, at 9, ¶¶ 34, 35.

Telemarketers moved to dismiss the fraud claims, urging that they were barred by the First Amendment. The trial court granted the motion,[5] and the dismissal order was affirmed, in turn, by the Illinois Appellate Court and the Illinois Supreme Court. The Illinois courts placed heavy weight on three decisions of this Court: *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980); *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S.

---

expenses." See App. 111, 169 (capitalization omitted). In any event, the sentence fragment counsel identified falls short of showing, in the face of established Illinois case law, that the court "found" the affidavits annexed by the Illinois Attorney General *dehors* the complaint. Counsel's contention is further clouded by the Illinois Supreme Court's explicit notation that "the Attorney General ha[d] attached to his complaint the affidavits of 44 VietNow donors." 198 Ill. 2d, at 352, 763 N. E. 2d, at 293.

[4] Illinois law provides that "[i]n any solicitation to the public for a charitable organization by a professional fund raiser or professional solicitor[,] [t]he public member shall be promptly informed by statement in verbal communications and by clear and unambiguous disclosure in written materials that the solicitation is being made by a paid professional fund raiser. The fund raiser, solicitor, and materials used shall also provide the professional fund raiser's name and a statement that contracts and reports regarding the charity are on file with the Illinois Attorney General and additionally, in verbal communications, the solicitor's true name must be provided." Ill. Comp. Stat., ch. 225, § 460/17(a) (2001).

[5] The parties subsequently stipulated to the dismissal of all remaining claims. App. to Pet. for Cert. 30–31.

947 (1984); and *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781 (1988). Each of the three decisions invalidated state or local laws that categorically restrained solicitation by charities or professional fundraisers if a high percentage of the funds raised would be used to cover administrative or fundraising costs. *Schaumburg,* 444 U. S., at 620; *Munson,* 467 U. S., at 947; and *Riley,* 487 U. S., at 781; see 198 Ill. 2d, at 359, 763 N. E. 2d, at 297.

The Illinois Supreme Court acknowledged that this case, unlike *Schaumburg, Munson,* and *Riley,* involves no prophylactic provision proscribing any charitable solicitation if fundraising costs exceeded a prescribed limit. Instead, the Attorney General sought to enforce the State's generally applicable antifraud laws against Telemarketers for "specific instances of deliberate deception." 198 Ill. 2d, at 358, 763 N. E. 2d, at 296 (quoting *Riley,* 487 U. S., at 803 (SCALIA, J., concurring)). "However," the court said, "the statements made by [Telemarketers] during solicitation are alleged to be 'false' only because [Telemarketers] retained 85% of the gross receipts and failed to disclose this information to donors." 198 Ill. 2d, at 359, 763 N. E. 2d, at 297. The Attorney General's complaint, in the Illinois Supreme Court's view, was "in essence, an attempt to regulate [Telemarketers'] ability to engage in a protected activity based upon a percentage-rate limitation"—"the same regulatory principle that was rejected in *Schaumburg[,] Munson,* and *Riley." Ibid.*

"[H]igh solicitation costs," the Illinois Supreme Court stressed, "can be attributable to a number of factors." *Ibid.* In this case, the court noted, Telemarketers contracted to provide a "wide range" of services in addition to telephone solicitation. *Ibid.* For example, they agreed to publish a newsletter and to maintain a toll-free information hotline. *Id.,* at 359–360, 763 N. E. 2d, at 297–298. Moreover, the court added, VietNow received "nonmonetary benefits by having [its] message disbursed by the solicitation process," and Telemarketers were directed to solicit "in a manner that

would 'promote goodwill' on behalf of VietNow." *Id.*, at 361, 763 N. E. 2d, at 298. Taking these factors into account, the court concluded that it would be "incorrect to presume . . . [any] nexus between high solicitation costs and fraud." *Id.*, at 360, 763 N. E. 2d, at 298.

The Illinois Supreme Court further determined that, under *Riley,* "fraud cannot be defined in such a way that it places on solicitors the affirmative duty to disclose to potential donors, at the point of solicitation, the net proceeds to be returned to the charity." *Id.*, at 361, 763 N. E. 2d, at 298.[6] Finally, the court expressed the fear that if the complaint were allowed to proceed, all fundraisers in Illinois would be saddled with "the burden of defending the reasonableness of their fees, on a case-by-case basis, whenever in the Attorney General's judgment the public was being deceived about the charitable nature of a fund-raising campaign because the fund-raiser's fee was too high." *Id.*, at 362, 763 N. E. 2d, at 299. The threatened exposure to litigation costs and penalties, the court said, "could produce a substantial chilling effect on protected speech." *Ibid.* We granted certiorari. 537 U. S. 999 (2002).

## II

The First Amendment protects the right to engage in charitable solicitation. See *Schaumburg,* 444 U. S., at 632 ("charitable appeals for funds . . . involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of

---

[6] Contracts for fundraising campaigns in Illinois must be filed with the State's Attorney General, see Ill. Comp. Stat., ch. 225, §§ 460/2(a)(10) and 460/7 (2001), and those contracts must disclose all fundraiser fees, including any "stated percentage of the gross amount raised" to be retained by the fundraiser, § 460/7(b); see § 460/7(d). The filings are open for public inspection. § 460/2(f). Illinois law also provides that fundraisers must disclose "the percentage to be received by the charitable organization from each contribution, if such disclosure is requested by the person solicited." § 460/17(b). Telemarketers did not challenge these requirements.

causes—that are within the protection of the First Amendment"); *Riley*, 487 U. S., at 788–789. But the First Amendment does not shield fraud. See, *e. g.*, *Donaldson* v. *Read Magazine, Inc.*, 333 U. S. 178, 190 (1948) (the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established"); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974) (the "intentional lie" is "no essential part of any exposition of ideas" (internal quotation marks omitted)). Like other forms of public deception, fraudulent charitable solicitation is unprotected speech. See, *e. g.*, *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147, 164 (1939) ("Frauds," including "fraudulent appeals . . . made in the name of charity and religion," may be "denounced as offenses and punished by law."); *Donaldson*, 333 U. S., at 192 ("A contention cannot be seriously considered which assumes that freedom of the press includes a right to raise money to promote circulation by deception of the public.").

The Court has not previously addressed the First Amendment's application to individual fraud actions of the kind at issue here. It has, however, three times considered prophylactic statutes designed to combat fraud by imposing prior restraints on solicitation when fundraising fees exceeded a specified reasonable level. Each time, the Court held the prophylactic measures unconstitutional.

In *Schaumburg*, decided in 1980, the Court invalidated a village ordinance that prohibited charitable organizations from soliciting contributions unless they used at least 75 percent of their receipts "directly for the charitable purpose of the organization." 444 U. S., at 624 (internal quotation marks omitted). The ordinance defined "charitable purposes" to exclude salaries and commissions paid to solicitors, and the administrative expenses of the charity, including salaries. *Ibid.* The village of Schaumburg's "principal justification" for the ordinance was fraud prevention: "[A]ny organization using more than 25 percent of its receipts on fund-

raising, salaries, and overhead," Schaumburg submitted, "is not a charitable, but a commercial, for-profit enterprise"; "to permit [such an organization] to represent itself as a charity," the village urged, "is fraudulent." *Id.*, at 636.

The Court agreed with Schaumburg that fraud prevention ranks as "a substantial governmental interes[t]," *ibid.*, but concluded that "the 75-percent requirement" promoted that interest "only peripherally." *Ibid.* Spending "more than 25 percent of [an organization's] receipts on fundraising, salaries, and overhead," the Court explained, does not reliably indicate that the enterprise is "commercial" rather than "charitable." *Ibid.* Such spending might be altogether appropriate, *Schaumburg* noted, for a charitable organization "primarily engaged in research, advocacy, or public education [that uses its] own paid staff to carry out these functions as well as to solicit financial support." *Id.*, at 636–637. "The Village's legitimate interest in preventing fraud," the Court stated, "can be better served by measures less intrusive than a direct prohibition on solicitation," *id.*, at 637: "Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly," *ibid.*

Four years later, in *Munson*, the Court invalidated a Maryland law that prohibited charitable organizations from soliciting if they paid or agreed to pay as expenses more than 25 percent of the amount raised. Unlike the inflexible ordinance in *Schaumburg*, the Maryland law authorized a waiver of the 25 percent limitation "where [it] would effectively prevent the charitable organization from raising contributions." 467 U. S., at 950–951, n. 2. The Court held that the waiver provision did not save the statute. *Id.*, at 962. "[No] reaso[n] other than financial necessity warrant[ed] a waiver," *Munson* observed. *Id.*, at 963. The statute provided no shelter for a charity that incurred high solicitation costs because it chose to disseminate information as part of its fundraising. *Ibid.* Nor did it shield a charity

whose high solicitation costs stemmed from the unpopularity of its cause. *Id.*, at 967.

"[N]o doubt [there] are organizations that have high fundraising costs not due to protected First Amendment activity," the Court recognized; it concluded, however, that Maryland's statute was incapable of "distinguish[ing] those organizations from charities that have high costs due to protected First Amendment activities." *Id.*, at 966. The statute's fatal flaw, the Court said, was that it "operate[d] on [the] fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Ibid.* As in *Schaumburg*, the Court noted, fraud could be checked by "measures less intrusive than a direct prohibition on solicitation": Fraud could be punished directly and the State "could require disclosure of the finances of a charitable organization so that a member of the public could make an informed decision about whether to contribute." 467 U. S., at 961, and n. 9.

Third in the trilogy of cases on which the Illinois Supreme Court relied was our 1988 decision in *Riley*. The village ordinance in *Schaumburg* and the Maryland law in *Munson* regulated charities; the North Carolina charitable solicitation controls at issue in *Riley* directly regulated professional fundraisers. North Carolina's law prohibited professional fundraisers from retaining an "unreasonable" or "excessive" fee. 487 U. S., at 784 (internal quotation marks omitted). Fees up to 20 percent of the gross receipts collected were deemed reasonable; fees between 20 percent and 35 percent were deemed unreasonable if the State showed that the solicitation did not involve advocacy or dissemination of information. *Id.*, at 784–785. Fees exceeding 35 percent were presumed unreasonable, but the fundraiser could rebut the presumption by showing either that the solicitation involved advocacy or information dissemination, or that, absent the higher fee, the charity's "ability to raise money or communicate would be significantly diminished." *Id.*, at 785–786.

Relying on *Schaumburg* and *Munson*, the Court's decision in *Riley* invalidated North Carolina's endeavor to rein in charitable solicitors' fees. The Court held, once again, that fraud may not be inferred simply from the percentage of charitable donations absorbed by fundraising costs. See 487 U. S., at 789 ("solicitation of charitable contributions is protected speech"; "using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud").

The opportunity to rebut the unreasonableness presumption attending a fee over 35 percent did not bring North Carolina's scheme within the constitutional zone, the Court explained. Under the State's law, "even where a prima facie showing of unreasonableness ha[d] been rebutted, the factfinder [still had to] make an ultimate determination, on a case-by-case basis, as to whether the fee was reasonable—a showing that the solicitation involved . . . advocacy or [the] dissemination of information [did] not alone establish that the total fee was reasonable." *Id.*, at 786.

Training on that aspect of North Carolina's regulation, the Court stated: "Even if we agreed that some form of a percentage-based measure could be used, in part, to test for fraud, we could not agree to a measure that requires the speaker to prove 'reasonableness' case by case based upon what is at best a loose inference that the fee might be too high." *Id.*, at 793. "[E]very campaign incurring fees in excess of 35% . . . [would] subject [fundraisers] to potential litigation over the 'reasonableness' of the fee," the Court observed; that litigation risk, the Court concluded, would "chill speech in direct contravention of the First Amendment's dictates." *Id.*, at 794. Especially likely to be burdened, the *Riley* opinion noted, were solicitations combined with advocacy or the communication of information, and fundraising by small or unpopular charities. *Ibid.* The Court cautioned, however, as it did in *Schaumburg* and *Munson*, that States need not "sit idly by and allow their citizens to be de-

frauded." 487 U. S., at 795. We anticipated that North Carolina law enforcement officers would be "ready and able" to enforce the State's antifraud law. *Ibid.*

*Riley* presented a further issue. North Carolina law required professional fundraisers to disclose to potential donors, before asking for money, the percentage of the prior year's charitable contributions the fundraisers had actually turned over to charity. *Ibid.* The State defended this disclosure requirement as a proper means to dispel public misperception that the money donors gave to professional fundraisers went in greater-than-actual proportion to benefit charity. *Id.,* at 798.

This Court condemned the measure as an "unduly burdensome" prophylactic rule, an exaction unnecessary to achieve the State's goal of preventing donors from being misled. *Id.,* at 800. The State's rule, *Riley* emphasized, conclusively presumed that "the charity derive[d] no benefit from funds collected but not turned over to it." *Id.,* at 798. This was "not necessarily so," the Court said, for charities might well benefit from the act of solicitation itself, when the request for funds conveyed information or involved cause-oriented advocacy. *Ibid.*

The Court noted in *Riley* that North Carolina (like Illinois here) required professional fundraisers to disclose their professional status. *Id.,* at 799; see Ill. Comp. Stat., ch. 225, § 460/17(a) (2001); *supra,* at 609, n. 4, 611, n. 6. That disclosure, the Court said, effectively notified contributors that a portion of the money they donated would underwrite solicitation costs. A concerned donor could ask how much of the contribution would be turned over to the charity, and under North Carolina law, fundraisers would be obliged to provide that information. *Riley,* 487 U. S., at 799 (citing N. C. Gen. Stat. § 131C–16 (1986)). But upfront telephone disclosure of the fundraiser's fee, the Court believed, might end as well as begin the conversation: A potential contributor who thought the fee too high might simply hang up. 487 U. S., at 799–

800. "[M]ore benign and narrowly tailored options" that would not chill solicitation altogether were available; for example, the Court suggested, "the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file," and "[it] may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements." *Ibid.*

## III

### A

The Court's opinions in *Schaumburg, Munson,* and *Riley* took care to leave a corridor open for fraud actions to guard the public against false or misleading charitable solicitations. See *Schaumburg,* 444 U. S., at 637; *Munson,* 467 U. S., at 961, and n. 9; *Riley,* 487 U. S., at 795, 800.[7] As those decisions recognized, and as we further explain below, there are differences critical to First Amendment concerns between fraud actions trained on representations made in individual cases and statutes that categorically ban solicitations when fundraising costs run high. See Part III–B, *infra.* Simply labeling an action one for "fraud," of course, will not carry the day. For example, had the complaint against Telemarketers charged fraud based solely on the percentage of donations the fundraisers would retain, or their failure to alert potential donors to their fee arrangements at the start of each telephone call, *Riley* would support swift dismissal.[8] A State's Attorney General surely cannot gain case-by-case ground this Court has declared off limits to legislators. .

---

[7] We are therefore unpersuaded by Telemarketers' plea that they lacked fair notice of their vulnerability to fraud actions. See Brief for Respondents 46, 49–50.

[8] Although fundraiser retention of 85 percent of donations is significantly higher than the 35 percent limit in *Riley,* this Court has not yet accepted any percentage-based measure as dispositive. See *supra,* at 615 (quoting *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 793 (1988)).

Portions of the complaint in fact filed by the Attorney General are of this genre. See, *e. g.*, App. 103, ¶ 72 (asserting that Telemarketers' charge "is excessive" and "not justified by expenses [they] paid"); *id.*, at 86, ¶¶ 67H–67I (alleging statutory violations based on failure to disclose to prospective donors Telemarketers' percentage fee). As we earlier noted, however, see *supra*, at 608–609, the complaint and annexed affidavits, in large part, alleged not simply what Telemarketers failed to convey; they also described what Telemarketers misleadingly represented.

Under Illinois law, similar to the Federal Rules of Civil Procedure, "[w]hen the legal sufficiency of a complaint is challenged by a . . . motion to dismiss, all well-pleaded facts in the complaint are taken as true and [the court] must determine whether the allegations . . . , *when interpreted in the light most favorable to the plaintiff,* are sufficient to establish a cause of action upon which relief may be granted." *Connick* v. *Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 490, 675 N. E. 2d 584, 588 (1997) (emphasis added). Dismissal is proper "only if it clearly appears that no set of facts can be proved under the pleadings which will entitle the plaintiff to recover." 198 Ill. 2d, at 351, 763 N. E. 2d, at 293.

Taking into account the affidavits, and reading the complaint in the light most favorable to the Attorney General, that pleading described misrepresentations our precedent does not place under the First Amendment's cover. First, it asserted that Telemarketers affirmatively represented that "a significant amount of each dollar donated would be paid over to Viet[N]ow" to be used for specific charitable purposes—rehabilitation services, job training, food baskets, and assistance for rent and bills, App. 9, ¶ 34; *id.*, at 124, 131, 145, 163, 169, 187, 189—while in reality Telemarketers knew that "15 cents or less of each dollar" was "available to Viet[N]ow for its purposes." *Id.*, at 9, ¶ 34. Second, the complaint alleged, essentially, that the charitable solicitation was a façade: Although Telemarketers represented that donated

funds would go to VietNow's specific "charitable purposes," *id.*, at 8, ¶ 29, the "amount of funds being paid over to charity was merely incidental to the fund raising effort," which was made "for the private pecuniary benefit of [Telemarketers] and their agents," *id.*, at 9, ¶ 35. Cf., *e. g., Voices for Freedom,* CCH Trade Reg. ¶ 23,080 (1993) [1987–1993 Transfer Binder] (complaint against fundraisers who, *inter alia,* represented that "substantial portions of the funds from [the sale of commemorative bracelets] would be used to support a message center for the troops stationed in the Persian Gulf," but "did not use substantial portions of the bracelet-sales proceeds to support the message center").

Fraud actions so tailored, targeting misleading affirmative representations about how donations will be used, are plainly distinguishable, as we next discuss, from the measures invalidated in *Schaumburg, Munson,* and *Riley:* So long as the emphasis is on what the fundraisers misleadingly convey, and not on percentage limitations on solicitors' fees *per se,* such actions need not impermissibly chill protected speech.

## B

In *Schaumburg, Munson,* and *Riley,* the Court invalidated laws that prohibited charitable organizations or fundraisers from engaging in charitable solicitation if they spent high percentages of donated funds on fundraising—whether or not any fraudulent representations were made to potential donors. Truthfulness even of all representations was not a defense. See *supra,* at 612–616. In contrast to the prior restraints inspected in those cases, a properly tailored fraud action targeting fraudulent representations themselves employs no "[b]road prophylactic rul[e]," *Schaumburg,* 444 U. S., at 637 (internal quotation marks and citation omitted), lacking any "nexus . . . [to] the likelihood that the solicitation is fraudulent," *Riley,* 487 U. S., at 793. Such an action thus falls on the constitutional side of the line the Court's cases draw "between regulation aimed at fraud and regulation

aimed at something else in the hope that it would sweep fraud in during the process." *Munson,* 467 U. S., at 969–970. The Illinois Attorney General's complaint, in this light, has a solid core in allegations that home in on affirmative statements Telemarketers made intentionally misleading donors regarding the use of their contributions. See *supra,* at 608–609.

Of prime importance, and in contrast to a prior restraint on solicitation, or a regulation that imposes on fundraisers an uphill burden to prove their conduct lawful, in a properly tailored fraud action the State bears the full burden of proof. False statement alone does not subject a fundraiser to fraud liability. As restated in Illinois case law, to prove a defendant liable for fraud, the complainant must show that the defendant made a false representation of a material fact knowing that the representation was false; further, the complainant must demonstrate that the defendant made the representation with the intent to mislead the listener, and succeeded in doing so. See *In re Witt,* 145 Ill. 2d 380, 391, 583 N. E. 2d 526, 531 (1991). Heightening the complainant's burden, these showings must be made by clear and convincing evidence. See *Hofmann* v. *Hofmann,* 94 Ill. 2d 205, 222, 446 N. E. 2d 499, 506 (1983).[9]

Exacting proof requirements of this order, in other contexts, have been held to provide sufficient breathing room for protected speech. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279–280 (1964) (action for defamation of public

---

[9] In *Riley,* this Court expressed concern that case-by-case litigation over the reasonableness of fundraising fees would inhibit speech. 487 U. S., at 793–794. That concern arose in large measure because the North Carolina statute there at issue placed the burden of proof on the fundraiser. The Court has long cautioned that, to avoid chilling protected speech, the government must bear the burden of proving that the speech it seeks to prohibit is unprotected. See *Freedman* v. *Maryland,* 380 U. S. 51, 58 (1965); *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958). The government shoulders that burden in a fraud action.

official); *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 502, and n. 19 (1984) (noting "kinship" between *New York Times* standard and "motivation that must be proved to support a common-law action for deceit").[10] As an additional safeguard responsive to First Amendment concerns, an appellate court could independently review the trial court's findings. Cf. *Bose Corp.*, 466 U. S., at 498–511 (*de novo* appellate review of findings regarding actual malice). What the First Amendment and our case law emphatically do not require, however, is a blanket exemption from fraud liability for a fundraiser who intentionally misleads in calls for donations.

The Illinois Supreme Court in the instant case correctly observed that "the percentage of [fundraising] proceeds turned over to a charity is not an accurate measure of the amount of funds used 'for' a charitable purpose." 198 Ill. 2d, at 360, 763 N. E. 2d, at 298 (citing *Munson*, 467 U. S., at 967, n. 16). But the gravamen of the fraud action in this case is not high costs or fees, it is particular representations made with intent to mislead. If, for example, a charity conducted an advertising or awareness campaign that advanced charitable purposes in conjunction with its fundraising activity, its representation that donated funds were going to "charitable purposes" would not be misleading, much less intentionally so. Similarly, charitable organizations that engage primarily in advocacy or information dissemination could get and spend money for their activities without risking a fraud

---

[10] Although this case does not present the issue, the Illinois Attorney General urges that a constitutional requirement resembling "actual malice" does not attend *"every* form of liability by charitable solicitors who misrepresent the use of donations." Reply Brief 16–17, n. 11 (internal quotation marks omitted). We confine our consideration to the complaint in this case, which alleged that Telemarketers "acted with knowledge of the falsity of their representations." *Ibid.*

charge. See *Schaumburg*, 444 U. S., at 636–637; *Munson*, 467 U. S., at 963; *Riley*, 487 U. S., at 798–799.[11]

The Illinois Attorney General here has not suggested that a charity must desist from using donations for information dissemination, advocacy, the promotion of public awareness, the production of advertising material, the development or enlargement of the charity's contributor base,[12] and the like. Rather, she has alleged that Telemarketers attracted donations by misleading potential donors into believing that a substantial portion of their contributions would fund specific programs or services, knowing full well that was not the case. See *supra*, at 608–609, 618–619. Such representations remain false or misleading, however legitimate the other purposes for which the funds are in fact used.

We do not agree with Telemarketers that the Illinois Attorney General's fraud action is simply an end run around *Riley*'s holding that fundraisers may not be required, in every telephone solicitation, to state the percentage of receipts the fundraiser would retain. See Brief for Respondents 14–19. It is one thing to compel every fundraiser to disclose its fee arrangements at the start of a telephone conversation, quite another to take fee arrangements into

---

[11] *Amicus* Mothers Against Drunk Driving (MADD), for example, states that its mission is "to communicate the message 'Don't Drink and Drive.'" Brief for Public Citizen, Inc., et al. as *Amici Curiae* 13. Telephone solicitors retained by MADD "reach millions of people a year, and each call educates the public about the tragedy of drunk driving, provides statistics and asks the customer to always designate a sober driver." *Ibid.* (internal quotation marks and citation omitted). Solicitations that described MADD's charitable mission would not be fraudulent simply because MADD devotes a large proportion of its resources to fundraising calls, for those calls themselves fulfill its advocacy/information dissemination mission.

[12] This Court has consistently recognized that small or unpopular charities would be hindered by limitations on the portion of receipts they could devote to subscription building. See *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947, 967 (1984); *Riley*, 487 U. S., at 794.

account in assessing whether particular affirmative representations designedly deceive the public.

## C

Our decisions have repeatedly recognized the legitimacy of government efforts to enable donors to make informed choices about their charitable contributions. In *Schaumburg*, the Court thought it proper to require "disclosure of the finances of charitable organizations," thereby to prevent fraud "by informing the public of the ways in which their contributions will be employed." 444 U. S., at 638. In *Munson*, the Court reiterated that "disclosure of the finances of a charitable organization" could be required "so that a member of the public could make an informed decision about whether to contribute." 467 U. S., at 961–962, n. 9. And in *Riley*, the Court said the State may require professional fundraisers to file "detailed financial disclosure forms" and may communicate that information to the public. 487 U. S., at 800; see also *id.*, at 799, n. 11 (State may require fundraisers "to disclose unambiguously [their] professional status").

In accord with our precedent, as Telemarketers and their *amici* acknowledge, in "[a]lmost all of [the] states and many localities," charities and professional fundraisers must "register and file regular reports on activities[,] particularly fundraising costs." Brief for Respondents 37; see Brief for Independent Sector et al. as *Amici Curiae* 6–8. These reports are generally available to the public; indeed, "[m]any states have placed the reports they receive from charities and professional fundraisers on the Internet." Brief for Respondents 39; see Brief for Independent Sector et al. as *Amici Curiae* 9–10. Telemarketers do not object on First Amendment grounds to these disclosure requirements. Tr. of Oral Arg. 43.

Just as government may seek to inform the public and prevent fraud through such disclosure requirements, so it may

"vigorously enforce . . . antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements." *Riley*, 487 U. S., at 800. High fundraising costs, without more, do not establish fraud. See *id.*, at 793. And mere failure to volunteer the fundraiser's fee when contacting a potential donee, without more, is insufficient to state a claim for fraud. *Id.*, at 795–801. But these limitations do not disarm States from assuring that their residents are positioned to make informed choices about their charitable giving. Consistent with our precedent and the First Amendment, States may maintain fraud actions when fundraisers make false or misleading representations designed to deceive donors about how their donations will be used.

\*       \*       \*

For the reasons stated, the judgment of the Illinois Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

The question presented by the petition for certiorari in this case reads as follows: "Whether the First Amendment categorically prohibits a State from pursuing a fraud action against a professional fundraiser who represents that donations will be used for charitable purposes but in fact keeps the vast majority (in this case 85 percent) of all funds donated." Pet. for Cert. i. I join the Court's opinion because I think it clear from the opinion that if the *only* representation made by the fundraiser were the one set forth in the question presented ("that donations will be used for charitable purposes"), and if the *only* evidence of alleged failure to comply with that representation were the evidence set forth in the question presented (that the fundraiser "keeps the

vast majority (in this case 85 percent) of all funds donated"), the answer to the question would be yes.

It is the teaching of *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 793 (1988), and *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947, 966 (1984), that since there is such wide disparity in the legitimate expenses borne by charities, it is not possible to establish a maximum percentage that is reasonable. It also follows from that premise that there can in general be no reasonable expectation on the part of donors as to what fraction of the gross proceeds goes to expenses. When that proposition is combined with the unquestionable fact that one who is promised, without further specification, that his charitable contribution will go to a particular cause must reasonably understand that it will go there *after* the deduction of legitimate expenses, the conclusion must be that the promise is not broken (and hence fraud is not committed) by the mere fact that expenses are very high. Today's judgment, however, rests upon a "solid core" of misrepresentations, *ante*, at 620, that go well beyond mere commitment of the collected funds to the charitable purpose.