**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

v.

TIMOTHY JAMES LYONS,
 *Defendant-Appellant.*

No. 04-50082

D.C. No.
CR-02-00319-DOC-
01

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

v.

GABRIEL SANCHEZ,
 *Defendant-Appellant.*

No. 04-50127

D.C. No.
CR-02-00319-DOC-
2

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
March 8, 2006—Pasadena, California

Filed July 17, 2006
Amended January 11, 2007

Before: Sidney R. Thomas and M. Margaret McKeown,
Circuit Judges, and Samuel P. King,* Senior Judge.

*The Honorable Samuel P. King, Senior United States District Judge
for the District of Hawaii, sitting by designation.

273

Opinion by Judge McKeown

**COUNSEL**

John H. Weston, Weston, Garrou & DeWitt, Los Angeles, California; William J. Kopeny, William J. Kopeny & Associates, Irvine, California, for the defendants-appellants.

Ellyn Marcus Lindsay, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**ORDER**

The Opinion filed on July 17, 2006, is amended as follows:

On slip Opinion page 7868, line 6: insert the following sentence after the citation to *United States v. Staten*, 450 F.3d 384, 386 (9th Cir. 2006): The argument that the district court should have imposed a "beyond a reasonable doubt" standard is foreclosed by our case law.

On slip Opinion page 7868, line 7: delete the paragraph beginning "As Sanchez and Lyons did not raise this argument . . ." and replace with the following text:

In light of the disproportionate enhancement, the district court's failure to apply the clear and convincing evidence standard was plain error. *See United States v. Jordan*, 256 F.3d 922, 930-31 (9th Cir. 2001) (holding failure to apply the appropriate standard affected substantial rights in circumstances similar to those presented here). Nonetheless, we decline to exercise our discretion to correct the error because the forfeited error does not result in a miscarriage of justice. *See United States v. Olano*, 507 U.S. 725, 736-37 (1993). Clear and convincing evidence, including bank records, financial analyses, and Sanchez's own admissions, supports the loss calculation. Neither defendant is entitled to full resentencing.

With these amendments, the panel has voted to deny the petition for panel rehearing. Judges Thomas and McKeown vote to deny the petition for rehearing en banc and Judge King so recommends. The full court has been advised of the petition for rehearing and rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* Fed. R.App. P. 35. The petition for panel rehearing and the petition for rehearing en banc are denied. No further petitions for rehearing or rehearing en banc will be entertained.

---

## OPINION

McKEOWN, Circuit Judge:

Rare is the person who relishes getting calls from those great patrons of the telephone, telemarketers.[1] Yet many char-

---

[1]One oft-repeated expression of the collective view of telemarketers is Jerry Seinfeld's response to a telemarketer's call:

ities, especially small, obscure or unpopular ones, could not fund their operations without telemarketers. Some professional telemarketers take the lion's share of solicited donations, sometimes requiring and receiving commission rates of up to 85%. Most donors would probably be shocked or surprised to learn that most of their contributions were going to for-profit telemarketers instead of charitable activities. But the Supreme Court has held that, under the First Amendment, the bare failure to disclose these high costs to donors cannot, by itself, support a fraud conviction. *Madigan v. Telemarketing Assocs, Inc.*, 538 U.S. 600, 606 (2003). Evidence of high fundraising costs may, nonetheless, support a fraud prosecution when "nondisclosure is accompanied by intentionally misleading statements designed to deceive the listener." *Id.*

In this appeal we consider, among other things, under what circumstances the government may introduce high commission rates as evidence in a criminal fraud case. Timothy Lyons and Gabriel Sanchez challenge their convictions for mail fraud and money laundering on the basis that they never lied, and never asked the telemarketers in their employ to lie, about the fact that around 80% of donations to their charities were earmarked for telemarketing commissions.

---

[TELEMARKETER]: Hi. Would you be interested in switching over to TMI long-distance service[?]

SEINFELD: Oh, gee, I can't talk right now. Why don't you give me your home number and I'll call you later? . . . .

[TELEMARKETER]: Well, I'm sorry. We're not allowed to do that.

SEINFELD: I guess you don't want people calling you at home.

[TELEMARKETER]: No.

SEINFELD: Well, now you know how I feel.

*available at* http://transcripts.cnn.com/TRANSCRIPTS/0102/14/nr.00. html.

Lyons and Sanchez did, however, misrepresent to donors how they spent contributions net of telemarketer commissions. Their undoing was not that the commissions were large but that their charitable web was a scam. Donors were told their contributions went to specific charitable activities when, in reality, almost no money did. We conclude that the government did not violate the First Amendment by introducing evidence that over 80% of donations went to telemarketers.

Lyons and Sanchez also claim non-constitutional error involving the admission of evidence and jury instructions. These claims lack merit. We affirm the convictions and order a limited remand pursuant to *United States v. Ameline*, 409 F.3d 1073, 1078-79 (9th Cir. 2005) (en banc).

## BACKGROUND

### I. FACTUAL BACKGROUND

We first describe the scheme Lyons and Sanchez devised, and then turn to the specific representations made to potential donors through both telemarketers and promotional pamphlets, and how Lyons and Sanchez actually spent the funds they received.

#### A. OVERVIEW OF THE SCHEME

Around early 1994, long-time friends Lyons and Sanchez decided to form a business in which Sanchez would run a church and Lyons would supervise telemarketers to raise money for the church. Sanchez formed the First Church of Life (FCL), which had no congregation, services or place of worship; its address belonged to the house of Sanchez's father. Lyons formed a fundraising company called North American Acquisitions (NAA).

In pursuit of their scheme, the pair created six charities under the FCL umbrella and selected names likely to attract

sympathy and donations, including the AIDS Research Association, Children's Assistance Foundation, Cops and Sheriffs of America, Handicapped Youth Services, U.S. Firefighters, and U.S. Veterans League. None of these charities had infrastructure separate from FCL. The groups also had little if any actual contact with the people or causes they purported to support.

NAA outsourced most operations to third-party telemarketers to solicit donations on behalf of FCL's charities. Donors usually sent checks, made out to the various FCL charities, to the telemarketers. On average, the telemarketers took 80% of the donated funds as commission. NAA kept another 10%, and the last 10% was deposited into the respective accounts of the six FCL charities. We explain later in greater detail how funds were distributed.

As a registered fundraiser, NAA filed annual financial reports with the State of California and disclosed all funds collected and all fees that went to the third-party telemarketers and NAA. By December 1997, FCL had lost its tax-exempt status in California, so Sanchez registered a new church in Nevada, Christian Outreach Ministries, through which he ran the six charities originally under the FCL umbrella.

In 1997, a California newspaper published articles calling Sanchez's operation a scam. Sanchez left Christian Outreach Ministries and began to work for NAA. The operation of the charities fell to other co-schemers.

Lyons and Sanchez went to Nevada, where they incorporated yet another church, Mercy Ministries, later renamed Glory Ministries. The church became the umbrella organization for six new charities, which inherited money and similar-sounding names from the old charities.[2]

---

[2]For example, AIDS Research Association became Children's AIDS Council; Cops and Sheriffs of America became the Police and Sheriffs Support Fund; U.S. Firefighters became Firefighters Assistance Foundation.

In 2000, Lyons sold the assets of NAA to Roger Lane. According to his employees, Lyons kept operational control of NAA. Although employees were told to regard him as a consultant, Lyons was still in charge and actively involved.

## B.  SPECIFIC REPRESENTATIONS AND FUNDS SPENT

During the course of the scheme, Lyons and Sanchez raised over $6 million for the various causes. Out of these millions raised on behalf of the six FCL charities, very little was spent on charitable activities—according to the government, about $4,800.[3] This amount is small, even as a percentage of the net donations received after paying telemarketers' commissions. Most of the charities' funds actually went to Sanchez's personal expenses—home rent, car payments, loan payments, legal expenses, medical expenses, and credit card payments.

Nevertheless, Lyons and Sanchez wrote scripts for telemarketers to read to would-be donors, as well as promotional pamphlets, that suggested otherwise.[4] Every script and pamphlet mentioned a number of specific charitable activities purportedly funded by donors' contributions. We review in turn each of the six charities, what each charity promised, and what each charity actually delivered.

AIDS Research Association claimed that its goals were to "provide funds to local A.I.D.S. hospitals to help find a cure or at least to help funding of drug programs which may enhance or lengthen the life of A.I.D.S. patients," and to "pro-

---

[3]The bank records were incomplete because certain electronic media were unreadable. Sanchez argued at trial that all of the funds for which the bank had lost records went to charity. However, Sanchez agreed that of all the funds for which the bank could provide "hard and fast" numbers, less than $5,000 went to charitable activities.

[4]Sanchez testified that "I wrote the brochure information; and in later years, I believe it was something that Mr. Lyons would write and I would approve, modify, and I would come up with a product that was . . . acceptable to both of us."

vide funds to local A.I.D.S. patients by giving in-home care or just helping out families when a person dies of A.I.D.S." No evidence indicates that the Association ever gave funds to hospitals, AIDS patients or their families. According to the government, the association raised $261,257 in 1998 and 1999 but spent no money at all on charitable activities.

Children's Assistance Foundation claimed that its goal was to "eventually open a facility [for] . . . long term care for children and their families," and that its activities included "relocat[ing] entire families" and "helping children and their families . . . by providing food, shelter, medical care, and simple family expenses." The group did not help multiple "families" or "children," though Sanchez himself provided exactly one woman and her child food and shelter for several months. The foundation raised $465,596 in 1998 and 1999, but could document spending just $100 on charitable activities.

Cops and Sheriffs of America claimed to finance "various crime prevention and drug awareness programs throughout the country" and provide police officers education on "state of the art" crime-fighting equipment and techniques. The group published a magazine annually containing paid advertisements. The charity changed its name to Police and Sheriff's Support Fund, which purported to provide free self-defense classes, financial support for neighborhood watch programs and "families of slain officers," and contributions to "The National Law Enforcement Officers Memorial." Of its advertised activities, the Fund offered only a single self-defense class attended by a few NAA or FCL employees. The group raised $828,928 in 1998 and 1999, with only $400 spent on charitable activities.

Handicapped Youth Services purported to help provide "wheelchairs, crutches, walkers or any other equipment that these children may need but financially cannot afford," and to take handicapped children to "fairs, museums, and amusement parks to give some cheer to their lives." In 1998 and

1999, the charity raised $602,643. The group documented spending no money at all on charitable activities.

The pamphlet for U.S. Firefighters said that it funded "various fire prevention and awareness programs throughout the country," including the education of "professional and volunteer firefighters" on "state-of-the-art equipment and techniques of firefighting and fire prevention." Apparently, one person went to low income houses in Orange County on behalf of the group, installed fire extinguishers and smoke detectors, left information, and gave away 50-75 fire extinguishers. Nothing in the record suggests that any firefighters were educated. In 1998 and 1999, the group raised $752,270 but could document only $3,015 spent on its charitable activities.

U.S. Veteran's League claimed to provide clothing, food, shelter, and career counseling to homeless veterans and purported to have formed scholarships and grants for veterans. Employees of Sanchez and Lyons testified that the charity carried out none of these activities. The League raised $955,806 in 1998 and 1999 but spent just $295 on charitable activities.

## II.   PROCEDURAL BACKGROUND

In October 2002, a grand jury charged Lyons and Sanchez, as well as Roger Lane and Steven Delatorre, with 33 counts of mail fraud, 11 counts of money laundering and one count of criminal forfeiture. Lane and Delatorre pleaded guilty just before trial.

At trial, the government introduced evidence of the misrepresentations Lyons and Sanchez made on behalf of each charity. The government introduced as exhibits the telemarketer scripts and promotional pamphlets prepared by Lyons and Sanchez, as described above. Donors testified as to what they were told by telemarketers. The government also explained

how Lyons and Sanchez, through their scripts and pamphlets, had misrepresented the nonprofit status of FCL and its charities.[5]

Evidence of the high commissions taken by telemarketers and how donations were actually spent formed a backdrop for testimony about the charities. Former employees testified that very little money was spent on charitable work. Some testified that Sanchez did no work while at the office, where he talked on the telephone and played video games. Former employees also testified that they had asked Lyons and Sanchez what precise charitable activities FCL engaged in. Lyons admitted to an employee that FCL and its progeny did nothing for charity, and Sanchez told another employee that it was none of her business what he did for charity.

The government presented pie-charts that summarized the bank records of each of the six charities and how they spent donations received. Each chart showed the total donations raised by each of the charities over roughly two years, between 1998 and 1999. For instance, the chart for Handicapped Youth Services showed that, from late 1997 to November 1999, the organization received $602,643 in donations. Of this amount, the chart showed that $520,313 or 85% went to NAA, and that $19,519 eventually went to a new account for Disabled Children's Charity (the second generation incarnation of Handicapped Youth Services). Of the $46,655 available for the charity to spend on its activities not including returned deposits and funds for which records are missing, the government's chart reflected that $0 was spent on charitable activities. The government explained that Sanchez

---

[5]The government noted that the materials authored by Lyons and Sanchez represented that the charities were registered § 501(c)(3) nonprofit organizations, and thus that any donations were tax deductible. The government argued that both Lyons and Sanchez knew that the basis for any tax exemptions was the fact that Sanchez called his organization a church, but that to receive a tax exemption, FCL had to apply for an exemption and receive formal recognition from the IRS. Lyons and Sanchez never sought formal approval of the organization's claimed nonprofit tax status.

actually spent the $46,655 on his own expenses, including his own sports car, house rent, legal fees unrelated to NAA or FCL, and personal medical bills.

Throughout the trial, as a foundation for its explanation that the charities established by Lyons and Sanchez spent almost no money on charitable activities, the government referred to the high commissions taken by telemarketers. The government's opening argument is fairly representative of the way it treated the high telemarketer commission rate throughout the trial:

> I'd like to talk now a moment about the money.

> You will hear during the course of this trial that out of every dollar raised from donors, 85 to 90 percent went to N.A.A., defendant Lyon's company. Not a dollar of that money . . . went for any charitable purpose whatsoever.

> Now, out of that money, . . . 75 to 80 percent went to professional telemarketers. The rates varied depending on the firm. And he kept the rest himself. He used it to pay his salary, his personal expenses . . . .

> Now, that leaves us with 10 percent approximately. That 10 percent was . . . deposited into an account under the name of the purported charity; for example, the Handicapped Youth Services account.

> Those accounts were under the control of defendant Sanchez.

> But of this money . . . you will hear that the vast majority of it went into the pockets of defendant Sanchez and those that worked for him — went to pay for their business expenses, their personal

expenses, and other items. Virtually no money went for any charitable purpose whatsoever.

In November 2003, after a two-day trial, the district court instructed the jury on the elements of mail fraud, co-schemer liability, and the relevance of high fund-raising costs to fraud:

In order for the defendant to be found guilt[y] of mail fraud as charged in counts 1 through 33 . . . [in violation of 18 U.S.C. §1341], the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly devised or knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

Second, the defendant knew that the promises or statements were false;

Third, the promises or statements made or facts omitted were material, that is, they would reasonably influence a person to part with money or property;

Fourth, the defendant acted with the intent to defraud; and

Fifth, the defendant used or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

. . . .

The phrases "scheme to defraud" and "scheme to obtain money or funds" mean any deliberate plan of action or course of conduct by which someone

intends to deceive or to cheat another, or by which someone intends to deprive another of something of value.

. . . .

The term "false or fraudulent pretenses, representations, or promises" includes actual direct false statements and includes the knowing concealment of facts that are material to the matter in question that were made or used with the intent to defraud.

. . . .

Each member of a scheme to defraud may be responsible for the actions of the other co-schemers performed during the course of and in furtherance of the scheme. A defendant is responsible for a co-schemer's fraudulent acts if:

One, the defendant himself was a member of the scheme to defraud;

Second, the defendant had the intent to defraud;

Third, the acts of co-schemers were performed during the course of and in furtherance of the scheme; and

Fourth, the defendant personally made up or participated in the scheme.

High fund-raising costs without more do not establish fraud. And mere failure to volunteer the fund-raiser's fee when contacting a potential donee without more is insufficient to establish fraud.

The jury convicted Lyons and Sanchez on all mail fraud and money laundering counts. The district court denied

Lyons' motion for a new trial and directed verdict. Lyons and Sanchez were each sentenced to 180 months in prison and three years of supervised release.

## ANALYSIS

Lyons and Sanchez challenge their convictions on constitutional and evidentiary grounds. They also argue that if their convictions stand, they are entitled to a remand under *Ameline*, if not full resentencings. Sanchez alone requests a remand to a different district judge.

## I. FIRST AMENDMENT AND FUNDRAISING COSTS

Lyons and Sanchez argue that their mail fraud convictions violated the First Amendment[6] because the district court allowed the government to use the high cost of fundraising as evidence of fraud even though they had not affirmatively misrepresented the cost of fundraising to donors. They raise a cluster of closely-related arguments, all premised on a similar misreading of *Madigan*.

[1] *Madigan* established a default rule in criminal prosecutions for fraud involving telemarketing: the "bare failure to disclose [the high cost of fundraising] directly to potential donors does not suffice to establish fraud." 538 U.S. at 606. That is, the mere fact that a telemarketer keeps 85% of contributions it solicits cannot be the basis of a fraud conviction, and neither can the fact that a telemarketer fails to volunteer this information to would-be donors. This fund-raising safe harbor stems from a trio of Supreme Court cases that barred states from adopting non-criminal regulations either (1) limiting the percentage of donations fundraisers (usually telemar-

---

[6]Constitutional issues are reviewed de novo. *Buono v. Norton*, 371 F.3d 543, 548 (9th Cir. 2004). A constitutional error is only harmless if it is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967).

keters) may take, or (2) requiring fundraisers to tell would-be donors about the percentage commission taken by fundraisers. *See Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 784-87 (1988); *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 950-54 (1984); *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 622-28 (1980). The Supreme Court articulated the First Amendment concern at stake in these fundraising cases this way: "Our prior cases teach that the solicitation of charitable contributions is protected speech, and that using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud." *Riley*, 487 U.S. at 789.

**[2]** The limit of this principle may be seen in *Madigan*'s holding that when "nondisclosure is accompanied by intentionally misleading statements designed to deceive the listener," the high cost of fundraising may be introduced as evidence of fraud in a criminal case. 538 U.S. at 606. *Riley* foreshadowed this result by noting that fraud prosecutions were "narrowly tailored" enough to be in "keeping with First Amendment directives," and that "the State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements." 487 U.S. at 800.

Lyons and Sanchez urge an extremely narrow view of *Madigan*, arguing that "*Madigan* held that if the fundraiser affirmatively misrepresented the costs of the fundraising, *then, and only then*, evidence of the costs might be utilized to demonstrate the fraudulent nature of any specific misrepresentations." (Emphasis added). The apparent basis for this argument is that in *Madigan*, the defendants directly lied to donors about the percentage of donations that went to charitable activities as opposed to fundraising.[7] Thus, Lyons and

---

[7] In *Madigan*, most donors were told that "a *significant* amount of each dollar donated would be paid over" to the charity. 538 U.S. at 605 (emphasis added). One donor was even told that 90% of her donation would go directly to the charity; yet another was told that no funds would go to labor expenses because " 'all members [were] volunteers.' " *Id.* at 608.

Sanchez urge that unless the government could show that they lied to donors about how much the telemarketers would receive, the government was barred from introducing evidence of the high commissions paid to telemarketers.

[3] *Madigan*'s reach is not as narrow as Lyons and Sanchez suggest: "So long as the emphasis [in the arguments made by the prosecution] is on what the fundraisers misleadingly convey, and not on percentage limitations on solicitors' fees *per se*, such actions need not impermissibly chill protected speech." *Madigan*, 538 U.S. at 619. The Supreme Court emphasized that "the First Amendment . . . case law emphatically do[es] not require . . . a blanket exemption from fraud liability for a fundraiser who intentionally misleads in calls for donations." *Id.* at 621. *Madigan* underscores that the state faces a high burden to demonstrate fraud, including the burden to prove that a defendant made knowing misrepresentations with the intent to defraud. *See id.* at 620. Thus, "[e]xacting proof requirements of this order, in other contexts, have been held to provide sufficient breathing room for protected speech." *Id.* (citing, inter alia, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

In *Madigan*, the defendants not only misrepresented the percentage of funds going to telemarketers, they also made false promises about how donations—even net of telemarketers' fees—were to be spent. Telemarketers "told prospective donors their contributions would be used for specifically identified charitable endeavors," such as food baskets, job training, rent and bill payments, and rehabilitation for veterans of the Vietnam War, even though donations did not pay for these activities. *Id.* at 608. The government alleged that, even taking into account the fact that fundraisers received 85% of donations, the charity itself spent only 3% of all funds (or only 20% of net donation proceeds) on providing charitable services. *See id.* at 607 n.1. The indictment charged that "the charitable solicitation was a facade" because "[a]lthough [the fundraisers] represented that donated funds would go to

[the charity's] specific charitable purposes, the amount of funds being paid over to the charity was merely incidental to the fund raising effort, which was made for the private pecuniary benefit" of the fundraisers and their agents. *Id.* at 618-19 (internal citations and quotation marks omitted).

**[4]** With respect to Lyons and Sanchez, the government both alleged in its indictment and offered evidence at trial of specific misrepresentations and omissions they made regarding the use of donated funds. Specifically, the government's evidence underscored the fact that virtually none of the money that ended up in the bank accounts of the six FCL charities went to any charitable activities at all, let alone the specific charitable activities mentioned in the telemarketers' calls or promotional pamphlets. These misrepresentations are nearly identical to the specific misrepresentations at issue in *Madigan. See id.* at 607 n.1 (misrepresenting that significant part of donations actually went to charitable activity when, even net of fundraising costs, very little did); *id.* at 608 (representing that donations would fund specific charitable activities for Vietnam veterans that were never carried out).

**[5]** Neither *Madigan* nor the First Amendment insulates defendants from criminal prosecution for fraudulent misrepresentations about their charitable endeavors. Rather, the government is constrained from charging that high fundraising costs *per se* are tantamount to fraud. Our case is much like *Madigan.* The fraud is banded by the blatant misrepresentations about the charities. However, admission of evidence regarding the fundraising costs was essential to understanding the overall scheme and the shell game of the multiple charities. The government did not violate Lyons' or Sanchez's First Amendment rights by introducing evidence that third-party telemarketers received 80% of funds donated to the various FCL charities because the government had also shown that Lyons and Sanchez, through their respective organizations, had made fraudulent misrepresentations regarding disposition of the charitable funds.

## II.  RULE 403 AND FUNDRAISING COSTS

**[6]** Lyons and Sanchez argue that the government's repeated emphasis throughout the trial on the cost of fundraising, specifically the high commissions received by telemarketers, constituted "unfair prejudice" substantially outweighing its probative value under Federal Rule of Evidence 403.[8] Under Rule 403, "unfair prejudice" is "an undue tendency to suggest decision on an improper basis." Rule 403 Advisory Committee Notes. We review the district court's Rule 403 decisions for abuse of discretion. *United States v. Leon-Reyes*, 177 F.3d 816, 821 (9th Cir. 1999).

Relying on selective excerpts from the record, Lyons and Sanchez claim that the government repeatedly emphasized the high commissions taken by third-party telemarketers, as if this fact alone were sufficient to sustain a fraud conviction. A review of the record and trial as a whole shows the government did not solely or relentlessly focus on the high cost of fundraising to prove fraud. To be sure, the government asked many witnesses about the high fundraising costs, but the vast bulk of questions concerned misrepresentations or FCL's failure to apply donated funds to charitable purposes. Nor was the high commission rate itself a basis of the government's fraud case. Rather, the commission was a legitimate expense and part of the overall picture of how the money was allocated.[9]

---

[8]Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[9]*See Madigan*, 538 U.S. at 625 (Scalia, J., concurring) ("[T]here can in general be no reasonable expectation on the part of donors as to what fraction of the gross proceeds goes to expenses. . . . [O]ne who is promised, without further specification, that his charitable contribution will go to a particular cause must reasonably understand that it will go there *after* the deduction of legitimate expenses . . . .") (emphasis in original).

Just as the government could not demonstrate fraud simply by showing that 80-90% of contributions went to telemarketing fees instead of charity, neither could it prove fraud solely by showing that 10-20% of donations were not spent on charity, without showing what happened to the remaining 80-90% of the funds.

**[7]** The evidence is overwhelming that between telemarketers' fees and Lyons' and Sanchez's personal expenses, the six FCL charities spent virtually no money on charitable activities promised to donors. The district court did not abuse its discretion in overruling the Rule 403 objections regarding fundraising costs.[10]

## III.   JURY INSTRUCTIONS

Lyons and Sanchez argue that the district court made four discrete errors, failing to instruct the jury (1) as to the proper scope of *Madigan*; (2) to be unanimous on the particular false representations made by Lyons or Sanchez; (3) to be unanimous on the theory of mail fraud because the government allegedly offered two theories (false representations or scheme to defraud); and (4) as to the correct elements of co-schemer liability. We review de novo whether the district court's jury instructions accurately stated the law. *United States v. Stapleton*, 293 F.3d 1111, 1114 (9th Cir. 2002).

### A.   *MADIGAN*

The following was, in relevant part, the district court's jury instruction as to the rule in *Madigan*: "High fund-raising costs

---

[10]Sanchez alone argued Rule 403 prejudice as to the admission of evidence on how he spent donated funds net of fundraising costs—about $700,000. Sanchez attempts to blur the distinction between fundraising costs and net charity proceeds; the latter is definitely probative as to the claimed fraud here. *Madigan* and the First Amendment surely do not preclude a district court from admitting evidence of how charitable funds, *net* of fundraising fees, are spent. *See* 538 U.S. at 607 n.1.

without more do not establish fraud. And mere failure to vol-unteer the fund-raiser's fee when contacting a potential donee without more is insufficient to establish fraud." According to Lyons and Sanchez, the jury instruction allowed the jury to believe that it could convict based on the confluence of these two facts that, taken independently, could not support a fraud conviction. That is, they claim the jury could have convicted based on high fundraising costs *and* the failure to volunteer information about fundraising costs to donors.

Lyons and Sanchez posit that the district court should have "directed the jury not to consider the high fundraising costs as any evidence of fraud *whatsoever*." Alternately, they propose that the instruction "should have told the jury that neither evidence of high fundraising costs nor evidence that such costs were not gratuitously disclosed, *nor any combination of both*, could be deemed any evidence of fraud absent *proof* of misrepresentations of these costs."

**[8]** The difficulty with their challenge is that the court's instruction was a nearly verbatim quotation from *Madigan*. *See* 538 U.S. at 624. It is difficult to understand the claim that the jury instruction was "flatly prohibited by the Supreme Court in *Madigan*" when the instruction quite appropriately quoted the controlling law.

## B. UNANIMITY AS TO A PARTICULAR FALSE PROMISE

Both Lyons and Sanchez claim that the district court should have instructed the jury that, to convict on mail fraud, it had to agree unanimously on the particular false promise or statement made by the defendants. Thus, according to Lyons and Sanchez, different members of the jury could have convicted them based on different false promises. For instance, some jurors may have decided to convict because Handicapped Youth Services did not provide wheelchairs to handicapped children as pamphlets promised, while other jurors may have

convicted because the AIDS Research Association failed to provide any funds to hospitals or AIDS patients.

**[9]** This argument is foreclosed by a long line of cases; the jury need not be unanimous on the particular false promise. *See, e.g.*, *United States v. Woods*, 335 F.3d 993, 998-99 (9th Cir. 2003) ("Under the mail fraud statute the government is not required to prove any particular false statement was made."). The district court instruction was proper.

## C.   UNANIMITY AS TO THE THEORY OF FRAUD

The next challenge to the jury instructions is that the district court should have instructed the jury to be unanimous on the *theory* of fraud. Lyons and Sanchez claim that the instructions given suggest two conceptually distinct theories of mail fraud liability: the "scheme to defraud" theory and the specific misrepresentation theory. Because this issue was not raised at trial, we review for plain error. *United States v. Sanders*, 421 F.3d 1044, 1050 (9th Cir. 2005).

**[10]** Ordinarily, the "general unanimity instruction suffices to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict." *United States v. Kim*, 196 F.3d 1079, 1082 (9th Cir. 1999). A specific unanimity instruction is required if it appears that there is a "genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *Id.* (citing *United States v. Anguiano*, 873 F.2d 1314, 1319 (9th Cir. 1989)) (internal quotation marks omitted).

**[11]** Nothing here suggests the jury might have been confused, nor do Lyons and Sanchez offer any evidence to suggest this was the case. *See United States v. Mastelotto*, 717 F.2d 1238, 1247 (9th Cir. 1983) (requiring special unanimity instruction when "a variance occurred between the single scheme charged in each count of the indictment and the proof

at trial" which indicated the existence of two schemes). Most importantly, though, the government did not present two "theories" of fraud. Lyons and Sanchez have miscast the jury instructions and created a false dichotomy between a "scheme to defraud" theory and a "false promises" theory. The jury instruction provided that, to prove mail fraud under 18 U.S.C. § 1341, the government was required to show that a "defendant knowingly devised or knowingly participated in a *scheme or plan to defraud*, or a *scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . .*" (emphasis added).

Thus, the "alternate" theories actually *both* involve schemes or plans. The jury instruction as given simply did not provide for mail fraud liability in the absence of a unifying scheme or plan. By following this instruction, the jury could not have convicted Lyons and Sanchez for making false promises in the abstract.

In any case, jurors need not be unanimous as to a particular theory of liability so long as they are unanimous that the defendant has committed the underlying substantive offense. *Kim*, 196 F.3d at 1083 ("[I]t was not necessary for the jurors in this case to unanimously agree on a specific classification of Kim's conduct.").[11] Here, the "scheme or plan to defraud" and "scheme or plan for obtaining money or property by means of false or fraudulent pretenses" both involve the same underlying statutory offense, a violation of 18 U.S.C. § 1341.

---

[11]*See also Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.") (internal citations and quotation marks omitted).

**[12]** Finally, sufficient evidence presented at trial showed that both Lyons and Sanchez had *both* devised a scheme to defraud donors and a scheme to obtain money by false pretenses. Under these circumstances, the district court did not commit plain error. *See United States v. Fredette*, 315 F.3d 1235, 1243 (10th Cir. 2003) (finding no plain error when the district court issued general unanimity instruction and "ample evidence" showed that defendant "*both* devised a scheme to defraud customers and dealers *and* devised a scheme to obtain money by false pretenses.") (emphasis in original).

### D.   C<small>O</small>-S<small>CHEMER</small> L<small>IABILITY</small>

We next consider the final challenge to the jury instructions, namely that the district court did not instruct the jury as to all the elements of co-schemer liability. The district court instructed that to convict on co-schemer liability, the jury had to find that (1) defendant was a member of the scheme; (2) he acted with intent to defraud; (3) the acts of the co-schemer were during and in furtherance of the scheme; and (4) defendant participated in the scheme. The district court did not instruct the jury that, for a defendant to be vicariously liable for the acts of his co-schemers, those acts must have been reasonably foreseeable and in furtherance of the scheme. *See United States v. Tarallo*, 380 F.3d 1174, 1184 (9th Cir. 2004)).

**[13]** The government argues that foreseeability is not an element of co-schemer liability. But the very case it cites, *Stapleton*, indicates that jury instructions must "limit[ ] vicarious liability to acts of co-schemers during the life of the scheme and *acts that were reasonably foreseeable* as a necessary and natural consequence of the fraudulent scheme." 293 F.3d at 1118 (emphasis added). *Stapleton* affirmed jury instructions that explicitly made foreseeability an element of co-schemer liability. *Id.* at 1115-16 ("For a defendant to be found guilty of an offense allegedly committed by a coschemer as part of the scheme, the offense must be one which would *reasonably*

*have been foreseen* to be a necessary and natural consequence of the scheme to defraud.") (emphasis added and original bolding omitted). Thus, the district court erred by not instructing the jury that foreseeability is an element of co-schemer liability.

The question, then, is the effect of this instructional error. Although this instruction was not challenged at trial, the error was not plain and did not affect the substantial rights of either Lyons or Sanchez. *See Sanders*, 421 F.3d at 1050.

[14] Lyons seeks to distance himself from co-schemer liability for any misrepresentations in the brochures for charities, Counts 13-33, all of which he argues were created after he had sold his business to co-schemer Roger Lane. But Lyons was still an active participant in the scheme, including the drafting of fraudulent pamphlets, long after he sold his business. Lyons not only authored the brochures, he was still in charge of NAA after Lane's purchase. Because Lyons was still actively participating in the fraud alleged, "foreseeability" was not an issue, and the district court's error was not plain and did not affect Lyons' substantial rights. *See Stapleton*, 293 F.3d at 1117 (noting that a defendant may only be vicariously liable for the acts of co-schemers that "occurred during the defendant's knowing participation or [were] an inevitable consequence of actions taken while the defendant was a knowing participant").

[15] As was the case with Lyons, many of the mail fraud counts against Sanchez are based on Sanchez's active participation in the scheme to defraud. They thus involve his liability as a principal.[12] The remaining counts in the indictment

---

[12]Sanchez asserts that "[e]ach of the fraud counts is based on the conduct of the telemarketers," and that the jury should have been instructed that he was only vicariously liable if the telemarketers were co-schemers, since he never personally lied to donors. His argument misapprehends how the indictment alleged mail fraud. None of the mail fraud counts cor-

involve actions in furtherance of the fraudulent scheme that were reasonably foreseeable. The counts of mail fraud relating to actions that took place after Sanchez left the scheme in late 2000 charged Sanchez with actions executed by co-schemers in accord with his explicit instructions. Mail fraud that took place after 2000, then, was "an inevitable consequence of actions taken while [Sanchez] was a knowing participant" in the scheme to defraud. *Id.* Thus the district court's error was not plain and did not affect Sanchez's substantial rights.

## IV.  SENTENCING

**[16]** Lyons and Sanchez request limited remands pursuant to *Ameline*, 409 F.3d at 1078-79. The government acknowledges that remand is appropriate and we grant the requests.

Lyons and Sanchez go a step further and ask for full resentencings because the district court should have applied the "beyond a reasonable doubt" standard to facts, aside from prior convictions, used for sentencing enhancement. Sanchez in particular argues that the loss calculations used to raise his sentence were not proven by clear and convincing evidence.

Generally, the pre-*Booker* standards of proof apply to sentencing, *see United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005) ("[T]he preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing."), though we have held that "the clear and convincing

---

responds with misrepresentations by telemarketers. The indictment alleges a scheme to defraud in which Sanchez participated. Each of the 33 counts of mail fraud is based on a separate mailing in furtherance of the scheme to defraud—mostly packages from NAA containing commission checks and supplies.

Sanchez also suggests that any fraud stemmed from unscripted lies told by telemarketers, but the indictment does not charge Sanchez with being liable for any unscripted lies told by telemarketers.

standard still obtains for an enhancement with an extremely disproportionate effect, even though the enhancement now results in the calculation of an advisory rather than a mandatory Guidelines sentence." *United States v. Staten*, ___ F.3d ___, No. 05-30055, 2006 WL 1542835, at *7 (9th Cir. June 7, 2006). The argument that the district court should have imposed a "beyond a reasonable doubt" standard is foreclosed by our case law.

In light of the disproportionate enhancement, the district court's failure to apply the clear and convincing evidence standard was plain error. *See United States v. Jordan*, 256 F.3d 922, 930-31 (9th Cir. 2001) (holding failure to apply the appropriate standard affected substantial rights in circumstances similar to those presented here). Nonetheless, we decline to exercise our discretion to correct the error because the forfeited error does not result in a miscarriage of justice. *See United States v. Olano*, 507 U.S. 725, 736-37 (1993). Clear and convincing evidence, including bank records, financial analyses, and Sanchez's own admissions, supports the loss calculation. Neither defendant is entitled to full resentencing.

## V.   REASSIGNMENT OF DISTRICT JUDGE

Sanchez alone has asked to be assigned to a different judge on remand, under 28 U.S.C. § 2106,[13] because "the district judge *does not like* Appellant." Actually, the tension appeared to be with Sanchez's attorney, not Sanchez himself, and nothing in the record supports an allegation of bias against Sanchez.

---

[13]Section 2106 provides: "[A]ny . . . court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

**[17]** After Sanchez's counsel raised several objections that the district judge seemed to find particularly objectionable, the judge noted his displeasure with Sanchez's counsel: "I control this courtroom. Do you understand that?" The judge stated that counsel's objections were not inadvertent error, refused counsel's apology, told him to object properly, and made the following comments to Sanchez's counsel in front of both defendants:

> I don't believe you. It's willful, and I will resolve this for you. I'm warning you. And by the time they fish your client out of prison, if he is convicted—and even if I'm overturned in terms of something I say in front of the jury, it will be years. So don't press me on it counsel. We are done with this discussion now. Have a nice lunch.

The government identifies no context or other facts that help drain the sting from the judge's comments. Nevertheless, Sanchez points to no other examples of purported bias by the district judge. These few comments alone do not justify reassignment of this case.

We may remand to a different district judge if a party can show personal biases or unusual circumstances, based on an assessment of three factors: (1) whether on remand the district judge can be expected to follow this court's dictates; (2) whether reassignment is advisable to maintain the appearance of justice; and (3) whether reassignment risks undue waste and duplication. *United States v. Peyton*, 353 F.3d 1080, 1091 (9th Cir. 2003).

Sanchez prevails on none of these factors. Nothing suggests that the district judge would fail to follow this court's mandate, even if it had been favorable to Sanchez. Nor do we believe that these comments will affect the fairness of proceedings on limited remand. We also have no reason to believe that reassignment is needed to maintain the appear-

ance of justice. Even after this limited exchange, the district judge made rulings favorable to Sanchez, departing downward on his criminal history score and refusing to impose a two-level enhancement for obstruction of justice, as requested by the government. Finally, as the government notes, reassignment would result in undue waste and duplication, particularly given the long procedural history of the case and complexity of issues involved.

**AFFIRMED** in part; **REMANDED** in part pursuant to *Ameline*.